**Jack Lang MASON, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1708L.**

United States Court of Federal Claims.

March 25, 1993.

Anthony I. Werner, Wheeling, WV, for plaintiffs.

Alan Brenner, with whom was Acting Asst. Atty. Gen. Myles E. Flint, Washington, DC, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after trial limited, pursuant to RCFC 42(c), to the issue of whether plaintiffs' complaint is barred by the six-year statute of limitations imposed by 28 U.S.C. § 2501 (1988). At issue is plaintiffs' knowledge, actual or constructive, of erosion damage to their land allegedly caused by the construction of dams by the Army Corps of Engineers on the Ohio River. Plaintiffs filed their complaint in the United States Claims Court, now the Court of Federal Claims, on December 20, 1991. Therefore, plaintiffs' claim must have accrued on or after December 20, 1985, in order to fall within the statute of limitations.

## FACTS

The following facts were either adduced at trial or derived from undisputed background information submitted by the parties in connection with defendant's earlier dispositive motion. Plaintiffs are fee simple owners of a tract of land in Wetzel County, West Virginia, located along the left descending (east) bank of the Ohio River at approximately river mile 122, measuring downriver from the head of the Ohio River at Pittsburgh, Pennsylvania. The land has an elevation of 626.0 ft. mean sea level ("m.s.l.") and extends from the mouth of Dry Run south to the mouth of Proctor Creek and the Village of Proctor.

The Pittsburgh District Office of the Army Corps of Engineers constructed, maintained, and operated the Hannibal Locks and Dam (the "Hannibal project"), a navigational structure located on the Ohio River at river mile 126.4. Construction of the Hannibal project began in 1967 and was completed in 1975; it has been operating since 1972. The Hannibal project plays no role in erosion or flood control. The navigational pool created and controlled by the Hannibal project is referred to as the Hannibal pool. Plaintiffs' property runs along the Ohio River within the Hannibal pool. From June or July 1974 to July 1975, the water level was raised from 602.2 ft. m.s.l. to the new Hannibal pool elevation 623.0, a 21-foot nominal increase.

In order to implement the Hannibal project, on August 8, 1967, the United States filed a declaration of taking concerning the subject property in the United States District Court for the Northern District of West Virginia. On October 23, 1972, a judgment order for the then-owners of plaintiffs' property was entered in the amount of $60,000.00, thereby enabling the Government permanently to overflow land below elevation 623.0 ft. m.s.l. and giving the Government a flowage easement for the occasional overflow of land lying above elevation 623.0 ft. m.s.l. The judgment specifically excepted future damage from wave action and erosion affecting land lying above elevation 626.0 ft. m.s.l.

On September 18, 1987, plaintiffs moved to reopen the civil action in order to determine the amount of damage due to erosion above 626.0 ft. m.s.l. and to require the Government to condemn their property. The district court denied the motion on January 12, 1988. The court ruled that the claim had been specifically excluded from the earlier judgment and remitted plaintiffs to filing an original action in the district court or in the Claims Court. An appeal to the United States Court of Appeals for the Fourth Circuit was voluntarily dismissed. Plaintiffs filed their complaint in the Claims Court almost four years after the district court dismissed their complaint.

After plaintiffs filed this action, defendant moved to dismiss based on deposition testimony of two of the plaintiffs, who later testified at trial. Because the deposition testimony was equivocal and guided by the vigorous standards on a motion to dismiss for lack of jurisdiction in takings cases, the court ordered that limited trial proceed on the facts concerning the accrual of plaintiffs' cause of action.

Jack Lang Mason, a one-third owner, traced his active involvement in the land to the 1983 timeframe, when his mother died and he became an heir. He had lived on the property in 1936 or 1937 and left around 1943. During the 1960s and 1970s, he visited the property about six times a year and walked the riverbank. He did not remember a lot of erosion before the dam was built. After the Hannibal pool was raised, he observed a loss of trees along the riverbank. He testified that during 1986 or 1987, when he was deer hunting in a cornfield on the property, he noticed cracking in the field ten feet away from the shoreline, that trees had been undercut and were leaning over the river, and that the property was losing ground. It was during this period that he viewed the pool level as being exceeded, although he had no idea where the elevation 626.0 ft. m.s.l. was situated. His reasoning was that when the water reached a certain level, it was where it was supposed to be pursuant to the earlier judgment. He estimated that this level was exceeded sometime during 1986 to 1987. On cross-examination defense counsel pointed out that in his deposition, taken in June 1992 approximately nine months before trial, Mr. Mason had testified that he noticed the erosive condition in 1984. By way of explanation, Mr. Mason offered that he mentioned 1984 in the context of his having become an heir in 1984 and began paying more attention to the property at that point.

On redirect, plaintiffs' counsel asked Mr. Mason when he first suspected that the erosion had reached beyond the elevation of 626.0 ft. m.s.l. that the Government had already paid for. The witness responded that he really did not know where that level was located, but that the erosive condition occurred during the 1985, 1986, or 1987 timeframe. According to Mr. Mason, trees were dropping off and falling into the river as a result of the bank slipping away during 1985 and 1986.

Plaintiffs' other witness at trial, Robert B. Baggs, Mr. Mason's uncle and another co-owner by marriage, is an elderly gentleman, who worked on the river for some 40 years. Mr. Baggs pinpointed the onset of unprecedented erosion in the mid–1970s when the pool elevation was raised, because he watched what happened over the years and was very interested in it. In response to his counsel's question, he stated that he noticed the erosion before the mid–1980s. As was the case with Mr. Mason, Mr. Baggs stated that he was uncertain where the elevation 626.0 ft. m.s.l. was located.

Defendant called James B. Hamel, Ph. D.,[1] a consulting engineer, who qualified as an expert in riverbank instability, erosion, landsliding, engineering, geology, and geotechnical engineering. His testimony was based on a review of historical records, stereoscopic (three-dimensional) vertical aerial photographs, and aerial oblique photographs, as well as an on-site inspection conducted in December 1992 when the river elevation was 623.8 ft. m.s.l. These 30 photographs were taken in 1974, before the Hannibal pool elevation was raised, in 1978, after the pool was established at its normal level, as well as in 1979, 1980, and 1982. Mr. Hamel identified significant erosional features in the 1978 photographs when the pool was at elevation 623.0 ft. m.s.l. and inferred that sometime between 1975 and 1978 erosional processes had worked upon the bank to produce the configurations evidenced in the 1978 photographs. The 1979–1982 photographs exhibited on-going erosional processes, according to the witness. The pool elevation increased from 623.0 ft. m.s.l. in the mid to late 1970s to 624.0 ft. m.s.l. in the 1980 photographs and was 623.5 ft. m.s.l. in the 1982 photographs. Mr. Hamel identified one 1982 photograph as showing that erosion had taken place above elevation 626.0 ft. m.s.l.

The expert offered three opinions: The upper bank segment was an erosional feature created by the Ohio River in the geological past; between 1978 and 1982 the processes of bank failure[2] and erosion

---

**1.** The witness prefers not to use the title of "Dr."

**2.** Mr. Hamel defined bank failure as involving a number of processes that lead to loss of materi-

were operative in the upper bank segment above the Hannibal pool; and the processes that he observed from the photographs continued to act on this upper segment from 1982 to 1992. He further opined that a large amount of the erosive features now present on plaintiffs' property had developed by 1982, although he concluded that there definitely had been some additional erosion on plaintiffs' banks between 1982 and 1992.

Mr. Hamel's testimony was scholarly and comprehensive, and he was helpful in answering questions from the bench. There is no evidence in the record that would undercut the opinions offered by Mr. Hamel. Coupled with the photographic evidence, his testimony is adequate to support findings in accordance with his opinions. However, on cross-examination, Mr. Hamel acknowledged that of the 50 photographs taken during his 1992 site inspection, when the pool elevation was 623.8 ft. m.s.l., 36 showed erosive damage above elevation 626.0 ft. m.s.l. The exposed riverbank in these photographs varies between elevation 623.8 and 630.0 ft. m.s.l. Bank failure and erosion were visible at six to seven feet above the river level in December 1992. Compared to the 1982 photographs, these photographs showed a dramatic increase in the amount of erosion. The witness stated that he was unable to specify at what point in the ten-year period the increase occurred.

## DISCUSSION

■ The statute of limitations began to run once the situation resulting from the impoundment of the Hannibal pool became stabilized, *i.e.,* the erosion was of a continuous nature that was, or should have been, apparent. *United States v. Dickinson,* 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947); *Cooper v. United States,* 827 F.2d 762, 764 (Fed.Cir.1987); *Loesch v. United States,* 227 Ct.Cl. 34, 61 n. 30, 645 F.2d 905, 924–25 n. 30, *cert. denied,* 454

U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981); *Barnes v. United States,* 210 Ct.Cl. 467, 480, 538 F.2d 865, 873 (1976).

Statute of limitations issues in takings cases are highly fact-specific and "[a]dopting the date of taking must often be done in a somewhat imprecise manner, this aspect of the cases being in the nature of a jury verdict." *Barnes,* 210 Ct.Cl. at 480 (citation omitted). Moreover, dam-caused flooding qualitatively differs from dam-caused flooding and consequent erosion. The controlling case is *Baskett v. United States,* 8 Cl.Ct. 201 (1985), *aff'd,* 790 F.2d 93 (Fed.Cir.) (unpubl.), *cert. denied* 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986). That case distinguished mere flooding from flooding and consequent erosion:

> The court opines that in cases in which it is alleged that dams are causing flooding alone, which results in a taking, utilization of the date of complete impoundment may be appropriate. However, in a case such as this one, in which erosion damage is claimed, the erosion may be more gradual and the effects not as readily apparent as would be the case with continuous flooding....

8 Cl.Ct. at 230. The Claims Court held that the elevation date (or flooding date) of dam-created pools is not necessarily the proper commencement date of the statute of limitations.

On the other hand, the court in *Baskett* also held that the riverbank need not be completely washed away before the statute begins to run. The court enunciated three disjunctive circumstances in which the statute of limitations begins to run:

> 1) Had the consequences of the inundation so manifested themselves that a final account could have been made of the damage?;[3] or
>
> 2) Was the damage a foreseeable future event?; or
>
> 3) Were the effects of the dam fully known by the landowners (*i.e.,* actual knowledge)?

---

al from the bank. Erosion has to do with transport away of material from the bank. The operative process he described was overall bank failure.

3. The court warned that this did not preclude the possibility of any further damage to the riverbank.

*See* 8 Cl.Ct. at 231. The court noted that many plaintiffs became aware of erosion shortly after dam installation. Even if the plaintiffs in *Baskett* did not have actual knowledge of the erosion, "often the mere passage of time is sufficient to presume that some of the erosion damage complained of would have manifested itself." 8 Cl.Ct. at 231. Applying the law to the facts of the case, the court found that several plaintiffs simply waited too long to sue after the pools were created to make a credible claim that they did not know of the erosion damage. For example, the Meldahl pool was elevated in March 1965. Plaintiffs filed suit in July 1978. The accrual cutoff date therefore was July 1972. The court did not accept plaintiffs' representation that from 1965–72 they had not noticed any erosion, stating that the damage would have manifested itself prior to 1972.

▮ In *Chipps v. United States*, 19 Cl. Ct. 201, *aff'd*, 915 F.2d 1585 (Fed.Cir.1990) (unpubl.), the Claims Court further refined the *Baskett* standard. In *Chipps* the court stated that

> [t]he complete impoundment date, however, may apply in cases where the plaintiff admits the taking occurred at that time. Complete impoundment may also mark the accrual time in cases where the evidence indicates that permanent damage was foreseeable from that time forward....

19 Cl.Ct. at 205. To summarize, a plaintiff definitely cannot postpone suit until the erosion damage is complete. On the other hand, a plaintiff may or may not postpone suit after impoundment or pool-creation, depending on how foreseeable or complete the damage is at that time.

▮ Defendant originally moved to dismiss the complaint for lack of jurisdiction based on the statute of limitations. The defense is affirmative and must be pleaded. RCFC 8(C). Plaintiffs therefore contend that defendant bears the burden of proof at trial. This issue is pivotal because, although plaintiffs' proof is weak, defendant's is not unequivocal. The Federal Circuit has not addressed the issue of which party bears the burden of proving at

trial that an action lies within the limitations period. The general rule is that a defendant has the burden of proof as to the statute of limitations defense and a plaintiff has the burden of proving an exception to the statute of limitations. *Knox v. Cook County Sheriff's Police Dept.*, 866 F.2d 905, 907 (7th Cir.1988); *Duvall v. United States*, 227 Ct.Cl. 642, 646 (1981); *accord Warner v. United States*, 223 Ct.Cl. 754, 755 (1980).

▮ The statute of limitations is jurisdictional in the Court of Federal Claims. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 272, 1 L.Ed.2d 306 (1957) (discussing this court's predecessor, the Court of Claims); *Hart v. United States*, 910 F.2d 815, 817, 818 (Fed.Cir.1990); *see United States v. Mottaz*, 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986). The rationale is that, in derogation of the sovereign's immunity, Congress conferred jurisdiction on the court to entertain certain claims and that no others could be asserted against the Government, including time-barred claims.

The conclusion is ineluctable that since the defense is jurisdictional, plaintiffs bear the burden of proof at trial. In discussing the statute as providing for federal district court jurisdiction, the Supreme Court explained, without the benefit of political correctness:

> The prerequisites to the exercise of jurisdiction are specifically defined and the plain import of the statute is that the District Court is vested with authority to inquire at any time whether these conditions have been met. They are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor. He must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing. If he does make them, an inquiry into the existence of jurisdiction is obviously for the purposes of determining whether the facts support his allegations. In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in

his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof....

*McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *see also Osei–Afriyie v. Medical College*, 937 F.2d 876, 884 (3d Cir.1991) (holding that plaintiff has the burden of proving at trial that the filed action is within the applicable period provided by state law).

■ Based on the testimony of Messrs. Mason and Baggs, as well as the five photographs taken in 1992 that were discussed with Mr. Hamel and admitted as exhibits for plaintiffs, the court cannot find that plaintiffs have proven by a preponderance of the evidence that their cause of action accrued after December 20, 1985. By contrast, defendant has presented strong evidence that significant erosional processes began by 1980. Mr. Mason's testimony was not precise; he had to contend with inconsistent deposition testimony and did not explain it away in manner that would convince the court that his recollection was sufficiently specific. The court cannot find that he first noticed the erosion getting worse at some period after December 20, 1985, than it was in the late 1970s or early–to–mid–1980s. With all due respect to Mr. Baggs and his efforts in traveling to Pittsburgh, Pennsylvania, to testify, the court considers his testimony, at best, as unhelpful to plaintiffs, or, at worst, inconsistent with that of Mr. Mason.

The photographs of the subject property are plaintiffs' strongest evidence, in that they demonstrate a marked worsening of erosive activity during the ten years between 1982 and 1992. At best, the photographs show that the bank failure, which Mr. Hamel described as the specific phenomenon occurring on the property, was aggravated during the decade, but not when it began. However, they do not assist in pinpointing the date or general period of time within which the erosion above 626.0 ft. m.s.l. became apparent. There is insufficient evidence to controvert Mr. Hamel's testimony that the erosion has been continuous on the riverbank since the mid 1970s. Mr. Hamel made the reasonable point that all that was required of plaintiffs to date the onset of erosion and the stabilized erosive condition, above elevation 626.0 ft. m.s.l., was to use a yardstick to measure the bank above the pool, which has usually been 623.0 ft. m.s.l. Since the witnesses did not know when the condition was exceeded, there is insufficient evidence upon which to base a finding that erosion above elevation 626.0 ft. m.s.l. has not been continuous since at least 1982 or, put another way, that it was manifested above 626.0 ft. m.s.l. sometime after December 1985. The court therefore finds and concludes that plaintiffs have failed to prove that their cause of action accrued within the applicable statute of limitations.

### CONCLUSION

Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment dismissing plaintiffs' petition (complaint). No costs.