CATELLUS DEVELOPMENT CORPORATION, a California Corporation, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 91–1313L.

United States Court of Federal Claims.

June 8, 1994.

Graeme Hancock, Phoenix, AZ, attorney of record for plaintiff.

Andrew M. Eschen, Washington, DC, for defendant.

## ORDER

LYDON, Senior Judge:

Catellus Development Corporation has sued in this court seeking compensation from the United States for an alleged taking of 1,920 acres of land in the California desert. The government has moved under RCFC 12(b)(1) to dismiss the case, arguing that the action is barred by the Tucker Act's statute of limitations. Having considered the parties' submissions and having heard oral argument, the court grants the government's motion to dismiss.

## FACTS

Catellus Development Corporation is the parent corporation and acting agent of SF Pacific Properties, Inc. The property which is the subject of this litigation was deeded to SF Pacific Properties, Inc. by Santa Fe Pacific Realty Corporation on December 22, 1989. Santa Fe Pacific Realty Corporation had acquired the property as a result of its merger with Southern Pacific Land Company in 1988. Southern Pacific Land Company itself acquired the property from the United States at some point prior to 1930. Santa Fe Pacific Realty Corporation changed its name to Catellus Development Corporation in 1990. For convenience, the entities which at some point have been the holders of record title to the property shall be collectively referred to as "Catellus."

Catellus is the owner of three sections of real property in San Bernardino County, California, described on official maps as sections 1, 13, and 25 of Township 6 North, Range 7 East, San Bernardino Base and Meridian. The property's area is about 1,920 acres (three square miles), and lies adjacent to land owned by the United States located at the Marine Corps Air Ground Combat Center at Twenty-nine Palms, California (hereinafter "Twenty-nine Palms"), in a very remote area in the Mojave Desert. As it appears on the ground, the property is similar to the areas all around it, save for some topographical variations. The property is nonagricultural and unimproved. No fences have ever been located on or around the property separating Catellus' land from the vast acreage of Twenty-nine Palms. The property is so remote that it is accessible only by helicopter or by a combination of off-road driving and hiking. It appears that the first time any representative of Catellus or its corporate predecessors viewed the property was in 1990, during a helicopter overflight with representatives of the Marine Corps.

The only documented use of the property between 1930 and 1989 was pursuant to a condemnation action filed in 1952 whereby the government, under a five-year lease, acquired the right to use the property in issue, as well as other properties, "for military and naval purposes as an artillery and anti-aircraft training area." The lease began on August 21, 1952 and was to end on June 30, 1953, but was extendible for yearly periods thereafter until June 30, 1958 at the election of the government. The record suggests the government continued to use the area after June 30, 1958, and when the Marine Corps installation was subsequently mapped the cartographers, noting the Corps' use of the land, erroneously included the six 640–acre sections as part of the installation proper.

On March 15, 1989, United States Oil and Mineral Corporation (which at no point has been a party in this case) inquired about the ownership of certain mineral interests in a section of land near the Lavic Lake Live Fire Training Area ("Lavic Lake") of the Twenty-nine Palms installation. There is no evidence that this inquiry involved plaintiff's lands. It appears that the land inquired about belonged to the Bureau of Land Management of the Department of the Interior (BLM). On April 21, 1989, the Commanding General of Twenty-nine Palms noted that it had come to his attention that an area measuring 3,840 acres (six 640–acre sections) had been operationally within Lavic Lake, and was likely to be contaminated with dud ordnance. Catellus owns three of these 640–acre sections; two of the others are owned by BLM and the sixth is owned by the State Lands Commission of California. As was the custom in the early days of railroading, the sections were arranged in a "checkerboard" fashion. The six sections, which apparently constituted a "buffer zone," ran north to south as follows: section 24 (BLM); section 25 (Catellus); section 36 (State of California); section 1 (Catellus); section 12 (BLM); and section 13 (Catellus). There is an indication in the material before the court that there is at least one active mine in operation on BLM's section 12 which abuts Catellus' section 13 on Catellus' northern boundary line. There were also other mining claims on the BLM section prior to 1989. Any bombardment that took place appears not to have precluded use of the property for this purpose.

The reason the Marine Corps felt that Catellus' property might be contaminated with dud ordnance is because it made mistakes in preparing maps of the area in which

Catellus' property adjoins Lavic Lake. The Corps had erroneously included these parcels within the boundaries of the Lavic Lake live air and ground ordnance training area. Immediately after learning of the error, the Marine Corps notified government agencies of the change of boundaries, contacted the landowners, and began to determine what it should do about the possibility of unexploded dud ordnance.

By a letter dated August 24, 1989, Lt. Col. James Taylor wrote to Catellus stating that the Corps had mistakenly believed that Twenty-nine Palms included three sections of land that belonged to Catellus. Presumably, similar letters were sent to BLM and the State of California. The letter advised that "[a]lthough the military now conducts no activities on this land, it was for years part of a live fire training area. For that reason, it is a virtual certainty that some unexploded ordnance is present there, above and below the surface." The Corps asked Catellus to limit its entry onto these lands because of the continuing danger presented by the ordnance. However, no evidence in the record demonstrates that there is indeed unexploded dud ordnance on Catellus' property, either above or below the surface. It appears that neither Catellus nor the Corps has taken steps to determine conclusively how extensively the land has been contaminated, or whether it has been contaminated at all. Taylor's "virtual certainty" statement regarding the presence of ordnance on the property can be better appreciated if considered in the context of a letter written by the Explosive Ordnance Disposal Officer at Twenty-nine Palms.

This letter, dated November 20, 1989, was sent to the manager of the Marine Corps' Natural Resources, Environmental Affairs division to describe the cost estimate and procedures for a cleanup of dud ordnance.

Describing the barriers to full excavation of the site, the disposal officer noted that:

> This particular area is located in what would be considered the buffer zone of the Combat Center.[1] Helicopter overflight indicates ordnance contamination of the area. Virtually every type of conventional ordnance could be encountered. Accuracy to even estimate the amount of possible dud ordnance is impossible to give. [The Combat Center] has been heavily utilized for ground, and air ordnance since the early 50's.[2]

Here, the subject property is described as being part of a "buffer zone" between the live fire training area at Lavic Lake and property not controlled by the government that lay outside Twenty-nine Palms. It is possible, but not probable, that at no time since shelling exercises in or around Lavic Lake began in the 1950s has ordnance ever hit Catellus' property. These two letters imply that the six acres the government erroneously thought it owned were used by the government to absorb any mistakes made during artillery exercises. Over the course of thirty-five years, it stands to reason that some ordnance may well have fallen inside this buffer zone.

At oral argument in this matter, counsel for Catellus directed the court's attention to Lt. Col. Taylor's "virtual certainty" statement that the property had been hit by shelling that was supposed to fall within the Lavic Lake area and not inside the buffer zone. Notwithstanding this statement, it appears that there is no obvious evidence of bombing on Catellus' property, a finding proffered by employees of Catellus itself. After the Marine Corps contacted Catellus with its August 24, 1989 letter, Duncan W. Robb, who at the time was Regional Land Manager for Santa Fe Pacific Railway Cor-

---

1. While not described in the materials before the court, it would appear that the buffer area was designed to provide a *buffer* or shield to prevent ordnance from falling on private property abutting the boundary with the Twenty-nine Palms installation. It would also appear that no targets were placed in the buffer zone and any ordnance that encroached on the buffer zone was unintended and represented a stray or erratic firing effort.

2. The cost to clean up the entire 3,840-acre area affected by the mapping error was roughly estimated at being between $32,000,000 and $40,000,000 over a course of four years. No attempt was made to allocate this rough estimate among the six sections of the 3,840 acre buffer area.

poration, flew in a helicopter on an inspection tour of the property. In an affidavit filed with the court, Robb compared the conditions at Lavic Lake with those at the subject property:

On the way to the Property, we flew over some of the interior portions of the Twenty–Nine Palms base. In the interior of the base I observed significant evidence of bombing and other military training activities. There appeared to be numerous tank tracks or other evidence of vehicle travel on the desert. There were also numerous old vehicles that looked like they had been used for target practice. The property damage in this area was easy to discern.

The Property was located some distance away from the portion of the base where I observed apparent damage and where it appeared that the bulk of the training exercises occurred. After we reached the area were [sic] we understood the Property to be located, it was very difficult to find any signs of bombardment or property damage. I also noticed that there were few, if any, signs of vehicle traffic or other visible evidence of the sort I had observed in the interior of the base.

Apart from the Marine Corps' cautionary "virtual certainty" statement and Robb's "understand[ing] that even though there may not be any obvious or observable property damage, there was still a significant possibility of subsurface live ordnance that could pose a serious threat to anyone using the Property," neither the government nor Catellus has clearly presented any evidence that the three sections owned by Catellus have been affected by stray ordnance. In its Third Supplemental Response to Defendant's Motion to Dismiss, Catellus states:

No admissible evidence establishes anything about the "live fire training exercises" alleged by the Government to have taken place prior to 1985 or what role, if any, the land involved in this lawsuit played in any exercise. Nothing shows whether these exercises actually involved the land in question, or whether they involved live firing from the land in question to other properties, or from other properties over the land in question. Except for inadmissible representations which Catellus referred to in its response to the request for admission, nothing shows when these alleged live fire exercises took place.

Further, Catellus states that because the subject property apparently lies within a buffer zone, "[o]ne can infer ... that the property in question may never have been targeted for bombardment and that any bombardment which occurred was, at best, incidental to any exercises that did occur."

In a letter dated December 14, 1989, the Marine Corps offered to lease the subject property from Catellus "for a nominal fee so as to shift the liability responsibility from your organization to the U.S. government." As the lease negotiations were developing, Catellus was advised by the Marine Corps that the government intended to acquire ownership of these lands either by exchange of surplus federal lands or outright cash purchase. Catellus emphasized to the Corps that it considered the lease to be an "interim measure" during the time required for the government to acquire the property. The parties were not able to agree to the terms of the proposed lease and purchase.

Catellus filed its complaint in this court on July 24, 1991. Having described the location of the subject property, the remainder of the complaint, exclusive of relief prayed for, is as follows:

5. Within six years of the filing of the petition, the United States Marine Corps, an agency of Defendant, has used Plaintiff's property described hereinabove for aerial live fire training drills and bombardment.[3]

---

**3.** In its answer to paragraph 5 of the complaint, government states: "Defendant admits that within six years of the filing of the petition the United States Marine Corps, an agency of the defendant, used property for aerial live fire training drills and bombardment, but denies that the property that it used was plaintiff's property." Plaintiff alleges this "admission" supports its position that a taking occurred. The court does not agree. Defendant's pleading is generalized, cryptic, and somewhat ambiguous. What this answer means, when considered in the context of the existing record, is that plaintiff's property was considered part of the large training area

6. As part of the live fire training drills, Plaintiff's property has been subjected to aerial bombing and bombardment. In addition, as a further result of the live fire training drills, unexploded ordnance has been placed and remains upon Plaintiff's property both above and below the surface.

7. The use of Plaintiff's property for live fire training drills has resulted in a substantial interference with Plaintiff's use and enjoyment of its property amounting to a taking thereof without compensation in violation of the Fifth Amendment of the Constitution.

In its answer, the government pleaded the statute of limitations as an affirmative defense and subsequently filed a motion to dismiss.[4] Catellus argues in its response that to determine when its claim first accrued, it needed to determine when the government first ran live fire training drills over its property, when the bombing occurred, and at what point the government's activities became a taking. By an order of the court filed on May 13, 1992, the government's request for a stay of discovery in this case pending a ruling on its motion to dismiss was denied, and discovery was allowed so that Catellus could obtain that discovery which is necessary to assist it in responding to the motion to dismiss. See *Catellus Development Corp. v. United States*, 26 Cl.Ct. 210, 212–215 (1992).

Following the May 13, 1992 order, the parties engaged in further discovery. Catellus asked the government to produce "[a]ll documents dated from 1969 to the present evidencing or referring or relating to the type of ordnance which has been placed or remains on the Subject Property...." Among the documents the government supplied to Catellus were notes taken during a Marine Corps sweep of the Lavic Lake area, conducted on or about September 26, 1984, that describe the types and numbers of unexploded ammunition found by the Corps during the sweep. The parties appear to agree that "extensive" discovery has taken place to date, discovery sufficient for the court to make an informed ruling on the present motion to dismiss.

In its most recent brief, the government states that the 1984 Lavic Lake sweep demonstrates that if any ordnance has hit Catellus' property, it clearly did so a time more than six years before Catellus filed its suit. In further support of this time-bar argument, the government notes that pursuant to the condemnation action filed in the United States District Court for the Southern District of California on July 16, 1952, the United States condemned for a term of years the right to the exclusive use and occupancy of approximately 558,829.28 acres in connection with its operations at Twenty-nine Palms. Of this acreage, 114,859.47 were owned by the Southern Pacific Land Company (a named defendant in the government's suit and Catellus' predecessor in title), an amount of land that might include the property at issue in this case. The condemnation was for "military and naval purposes as an artillery and anti-aircraft training area," and the parties stipulated that the "just compensation to be paid for the exclusive use and occupancy of said property by the United States of America, inclusive of interest, [was] the sum of $2,400 per annum" from August 21, 1952

---

but was used as a buffer zone and that ordnance may or may not have strayed into this zone.

**4.** After filing its answer, the government served written Requests for Admissions upon Catellus pursuant to Rule 36. In its response to Request for Admissions number 1, Catellus admitted "that according to information provided to it by Defendant, and solely based on that information, prior to July 24, 1985, Defendant used the property described in paragraph 5 of Plaintiff's Petition for Inverse Condemnation for live fire training drills and bombardment." This admission initially was the centerpiece of the government's motion to dismiss based on the statute of limitations defense. On the date of oral argument on

this motion, Catellus moved to withdraw its admission, emphasizing that the admission was based on what defendant told it and that withdrawal of the admission would enhance the presentation of the merits of the action without prejudicing the government's maintaining its defense on the merits at trial. The government opposes this motion to withdraw. Catellus' motion to withdraw its admission is granted since the court need not and does not rely on this admission in reaching a decision on the jurisdictional issue before it. See *LaMear v. United States*, 9 Cl.Ct. 562, 568 n. 6, aff'd., 809 F.2d 789 (Fed.Cir.1986).

through June 30, 1958. The government argues that the effect of this judgment is that any claim founded upon the presence of unexploded ordnance would have expired under the statute of limitations no later than 1964.

## DISCUSSION

1. Standards for Evaluating the Statute of Limitations Defense.

In order for the court to entertain a claim, a plaintiff must sue within six years after the claim first accrues. 28 U.S.C. § 2501. Statute of limitations issues in takings cases are generally highly fact-specific and "[a]dopting the date of taking must often be done in a somewhat imprecise manner, this aspect of the cases being in the nature of a jury verdict." *Mason v. United States*, 27 Fed.Cl. 832, 835 (1993) (quoting *Barnes v. United States*, 210 Ct.Cl. 467, 480, 538 F.2d 865, 873 (1976)).

▇▇▇ In much of the briefing on the motion before the court, the parties have debated the issue of who bears the burden of proof on a statute of limitations defense. The Supreme Court has stated that this court's six-year statute of limitations is jurisdictional, and a failure to comply with the statute of limitations places the claim beyond the court's power to hear and decide. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957). This court's jurisdiction is always strictly construed because it depends on the consent of the sovereign to be sued, and is not to be extended by implication. *Kirby v. United States*, 201 Ct.Cl. 527, 539, 1973 WL 21341 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974).[5]

▇▇▇ As the Court of Federal Claims explained in *Mason*, "[t]he conclusion is ineluct-

able that since the defense is jurisdictional, plaintiffs bear the burden of proof at trial." *Mason v. United States*, 27 Fed.Cl. at 836. And, because the court's jurisdiction may be raised by the parties or by the court on its own motion at any time during the litigation, *Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed.Cir.1988), a plaintiff bears the burden of proving jurisdiction when the question of jurisdiction has been raised in the context of a dispositive motion. In light of the attempts by each party in the case to shift the burden of proving jurisdiction onto the other, the Supreme Court's thoughts on this issue, discussing federal court jurisdiction generally and cited approvingly by the Court of Federal Claims, merit reproduction:

> The prerequisites to the exercise of jurisdiction ... are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor. He must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing. If he does not make them, an inquiry into the existence of jurisdiction is obviously for the purposes of determining whether the facts support his allegations. In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his

---

**5.** Strict construction of this jurisdictional requirement also better advances a primary objective of statutes of limitations, namely, "to prevent factual issues from being tried too long after the events occurred—with witnesses dead or gone, records lost or destroyed, and memories confused or dimmed—at a time when the past cannot be reconstructed with any pretense of accuracy." *Alliance of Descendants of Texas Land Grants v. United States*, 27 Fed.Cl. 837, 842

(1993) (quoting *Camacho v. United States*, 204 Ct.Cl. 248, 260, 494 F.2d 1363, 1370 (1974)). These objectives must be borne in mind when considering the defense of limitations in this case. This case involves events which occurred over a period of almost forty years, and there is a scarcity of records and memories as to the frequency, duration, location, extent, and impact, if any, of live air and ground training exercises on the property.

adversary in any appropriate manner, he must support them by competent proof. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) (*quoted in Mason v. United States,* 27 Fed.Cl. at 836–37). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746, 747 (Fed.Cir.1988).

In its review of a Rule 12(b)(1) motion to dismiss, the court must consider the facts alleged in the complaint to be true and correct. *Id.* at 747 (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). However, if the government's motion challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence in order to resolve the factual dispute. *Id.* (citing *Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 1010–11, 91 L.Ed. 1209 (1947)).[6]

### 2. When Did the Claim Accrue?

"It is hornbook law that a claim does not accrue until all events necessary to fix the liability of the defendant have occurred— when the 'plaintiff has a legal right to maintain his or her action.'" *Catawba Indian Tribe v. United States,* 982 F.2d 1564, 1570 (Fed.Cir.1991) (quoting Corman, *Limitation of Actions,* § 6.1). The statute of limitations, however, can be tolled in certain circumstances. A cause of action first accrues when "all the events which fix the government's liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.

1988). To toll the statute of limitations, a claimant must demonstrate his "ignorance" of the claim by either "show[ing] that defendant has concealed its acts with the result that plaintiff was unaware of their existence or [showing] that its injury was 'inherently unknowable' at the accrual date." *Japanese War Notes Claimants Ass'n v. United States,* 178 Ct.Cl. 630, 634, 373 F.2d 356, 359, *cert. denied,* 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). This standard is objective; it does not matter what plaintiff's subjective interpretation of the facts may have been. Plaintiff's ignorance of a claim of which it should be aware is not enough to toll the statute. *Coastal Petroleum Co. v. United States,* 228 Ct.Cl. 864, 866, 1981 WL 21512 (1981). Furthermore, "[w]here the actions of the government are open and notorious, we have pointed out that plaintiff is on inquiry as to its possible injury. Once plaintiff is on inquiry that it has a potential claim, the statute of limitations begins to run." *Id.* at 867 (citations omitted).

Having considered the record developed in briefing the motion to dismiss, the court finds that the area in and around Lavic Lake was routinely used as a live fire training area for some thirty years before July 24, 1985. This conclusion is compelled by statements written by the Ordnance Disposal Officer at Twenty-nine Palms that bombing had been ongoing since the early 50s, sweeps of Lavic Lake and other areas of Twenty-nine Palms indicating the presence or ordnance, and the government's condemnation action against the property during the 50s. It is reasonable to conclude that mapping errors made during or after the condemnation period are what

---

6. Early in the briefing on the government's motion to dismiss, Catellus suggested that the government's motion should be evaluated under a standard commonly associated with motions to dismiss for failure to state a claim, namely, a claim should not dismissed unless it is beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. In its most recent brief Catellus uses language associated with summary judgment motions, stating that its evidence establishes genuine issues of material fact sufficient to defeat the motion. As this is a Rule 12(b)(1) motion challenging jurisdiction, neither of these standards is appropriate. When facts are analyzed in the context of a jurisdictional challenge, plaintiff is not entitled to have every

inference drawn in its favor. In *LaMear v. United States,* the court stated:

> As a factual attack on jurisdiction, we do not consider plaintiff's allegations as true for the purposes of the motion. Rather, we are obliged to look beyond the pleadings and decide for ourselves those facts, even if in dispute, which are necessary for a determination of the jurisdictional merits of defendant's motion. We are constrained to so proceed because the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*LaMear v. United States,* 9 Cl.Ct. 562, 568 n. 6, *aff'd,* 809 F.2d 789 (Fed.Cir.1986).

led the Corps to believe that it, not other parties, owned the six-acre buffer zone. However, determining that the Marine Corps started its aerial bombing in this area long before 1985 does not resolve the fact question generated by the statute of limitations, namely, if any ordnance did indeed fall on Catellus' property, when was the government's liability to Catellus "fixed?" Put another way, the court must determine at what point an aerial bombardment effects a taking. Catellus' claim will not be time-barred if it can demonstrate that its claim did not accrue until a post-July 24, 1985 event took place.[7]

Catellus argues that the facts, as they have been developed to this point, indicate only that certain activities took place on its land up to April 1989; the point at which a taking may have actually occurred is not known. In support of this proposition, Catellus cites *Barnes v. United States,* 210 Ct.Cl. 467, 538 F.2d 865 (1976), a case in which government construction of dams caused rivers, over time, to rise to a point where it could be said with relative certainty that the flooding would be permanent. *Id.* at 480, 538 F.2d at 873. In *Barnes,* the Court of Claims cited the Supreme Court's view of when a government-caused flooding causes a taking claim to accrue. The Supreme Court explained: "The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous.... [T]here is nothing in legal doctrine[ ] to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized." *Id.* (citing *United States v. Dickinson,* 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947)).

This rule, that a taking does not accrue until the effect on the land can be fully appreciated, has held fast in flooding cases. When, however, the nature of the government invasion is more obvious, easily ascer-

tainable, and unmistakably permanent, "the usual rule is that the time of the invasion constitutes the act of taking, and '[i]t is that event which gives rise to a claim for compensation and fixes the date as of which the land is to be valued....'" *United States v. Clarke,* 445 U.S. 253, 258, 100 S.Ct. 1127, 1130–31, 63 L.Ed.2d 373 (1980) (quoting *United States v. Dow,* 357 U.S. 17, 22, 78 S.Ct. 1039, 1044–45, 2 L.Ed.2d 1109 (1958)). About *Dickinson,* on which Catellus indirectly relies, the Supreme Court in *Dow* stated:

> The expressly limited holding in Dickinson was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use. In the present case there is no dispute over the fact that the United States appropriated [plaintiff's land] on the date that it entered into physical possession under order of the District Court.

*United States v. Dow,* 357 U.S. at 27, 78 S.Ct. at 1047.

The facts in this case more resemble those in *Dow* than those in *Dickinson.* When ordnance falls into an area, a physical invasion of the property takes place, and this is the point at which a taking occurs. Unlike *Dickinson* or *Barnes,* in which it was not known until years after the government's initial entry if the invasion was permanent, Catellus would have been deprived of the use of its property from the onset. Admittedly, and unfortunately, the record does not clearly show that Catellus' three sections have been hit by ordnance, and if the section have been hit, when the impacts happened. The *Dickinson* and *Dow* line of cases state that a taking claim based on a physical invasion and consequent appropriation of property accrues at the time the invasion is obvious, ascertain-

---

7. No live fire training event has been documented for the post-July 24, 1985 period in the materials before the court. Catellus suggests that live fire training must have occurred during the post-July 24, 1985 period because Lt. Colonel Taylor advised in his August 24, 1989 letter that the Combat Center of the installation "has been heavily utilized for ground and air ordnance since the early 50's." This generalized statement cannot be particularized for the post-July 24,

1985 period. As indicated previously, those events were sufficient to establish a prima facie case that sufficient bombardment activities occurred to indicate that a taking claim occurred before July 24, 1985. At the very least, these pre–1985 events require that Catellus do more than simply ignore them since it has the burden to show when its claim occurred. Left ignored, these events give vitality and substance to the government's statute of limitations defense.

able, and permanent. Therefore, to show that its claim accrued no earlier than July 24, 1985, Catellus must show, by a preponderance of the evidence, that it was only after this date that any ordnance at all fell onto its property. Considering the thirty-year history of artillery exercises at Lavic Lake before 1985, this proposition is a difficult one to demonstrate, and demonstrating it is a task that Catellus has not discharged successfully.

In summary, Catellus has failed to carry its burden of showing when its taking claim accrued. The government has made a prima facie case that any taking of Catellus' property, if in fact it was taken, occurred prior to July 24, 1985. *See LaMear v. United States,* 9 Cl.Ct. at 569. Catellus was given the opportunity to conduct discovery and to present oral argument against this defense. *See Reynolds v. Army and Air Force Exchange Service,* 846 F.2d at 748. Catellus failed to persuade the court that a trial on the matter would produce anything more significant than the material and arguments presently before the court, and Catellus has failed to carry its burden of showing clearly that the court has jurisdiction over the claim it is asserting.

3. Tolling: "Government Concealment" and "Inherently Unknowable"

As noted above, a taking claim can accrue only when a plaintiff knew or should have known of its existence. The statute of limitations will be tolled if the government concealed the facts of the taking or if those facts were inherently unknowable.

■ Over the course of briefing on this motion, Catellus appears to have distilled its sundry arguments for tolling the statute of limitations into its assertion that the statute should be tolled because its claim was "inherently unknowable" until it received Lt. Colonel Taylor's letter in August 1989. Catellus states that the three affidavits it has submitted "effectively establish that neither Catellus nor its predecessors knew of any bombing or interference with the property until 1989," and that "the undisputed facts show that the property owner did not have any knowledge of any activity on the land or any bombardment of the property." Even if it is true that no one at Catellus actually knew of

the bombing before 1989, the facts do not bring Catellus within the "inherently unknowable" exception. Significantly, Catellus ignores the 1952 condemnation proceedings, a matter of public record.

The fact that a plaintiff happens to be ignorant of a potential claim, whether because the plaintiff was not diligent in monitoring its land or because observing the taking would exact a hardship on plaintiff in terms of money, manpower, time and effort, is not enough to toll the statute. When a claim is inherently unknowable it does not mean that the claim is "somewhat difficult to discover," or is "not entirely obvious." That which is inherently unknowable is that which is unknowable by its very essence, i.e., its existence at the critical moment simply cannot be ascertained. A classic example is provided in *Japanese War Notes Claimants Association,* 178 Ct.Cl. at 634, 373 F.2d at 359, in which the court considers the hypothetical of a defendant who delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit. "In this situation," the court notes, "the statute will not begin to run until plaintiff learns or reasonably should have learned of his cause of action."

■ Catellus has put forth a host of reasons why, even if its claim arose before July 24, 1985, its claim was inherently unknowable, e.g., no notice was given by the military that it was bombing in the area; no fences were ever erected around Catellus' property; no employee of Catellus knew of the history of bombardment at the site until 1989; no signs of property damage were readily visible from the air; no person charged with managing large amounts of unimproved land could justify the cost of inspecting such property; no prudent property manager inspects land for live subsurface ordnance; no employee or agent of the property had actual knowledge of military activity at its site. Essentially, Catellus provides the court with a number of explanations for why it didn't know about the claim, but provides no reason why the claim was unknowable. The "government concealment" and "inherently unknowable" exceptions are judicially crafted doctrines that af-

ford the relief of equitable tolling to those plaintiffs who could not become aware of their claims because of circumstances that lay beyond their control. As the statute of limitations is to be strictly construed in this court, a plaintiff seeking tolling of the statute must clearly show he can invoke one of these exceptions. Catellus has not done so. It is fair to charge a property owner with knowledge of what happens on his land, and the essence of Catellus' claim could have been discovered with the type of inquiry expected of a diligent property owner. That Catellus now claims that its property "is undeveloped land, held for investment and future development" does nothing to support its suggestion that it did not know or could not have known about its claim.[8]

In addition, Catellus makes a number of related arguments that the damage to its property was either concealed or inherently unknowable because the terrain is inaccessible, access to the property was limited by the Corps after 1989 because of the danger from unexploded ordnance, and that the nature and extent of the damage to the property are not a matter of public record. The submissions demonstrate that access to the area was not limited; the Corps, when it informed Catellus and others of its mapping errors, also cautioned them about the potential for harm from unexploded ordnance. Catellus was not prohibited by edict or otherwise from going onto its lands. As indicated earlier, mining operations were and are being conducted on the BLM section, which presumably is laboring under the same "threat" of unexploded ordnance. There is nothing indicating that the government intentionally concealed its activities on the property from Catellus. As noted above, there is no assertion in the materials before the court or at oral argument that any representative of Catellus had even visited the property until 1990, when Robb flew in the Marine helicopter over the property, thirty-five years after the Corps started to use the Lavic Lake area as a ground and air ordnance training site. Indeed, there is no indication that any representative of Catellus even visited the property, by air or land, during the period 1981–1989. Accordingly, Catellus' arguments in this vein are meritless.

 Catellus has not been able to demonstrate either that the government concealed its actions or that its actions were inherently unknowable.[9] Accordingly, the

---

8. Catellus contends that until it received the August 1989 letter from the Marine Corps, it had no idea that it property was being used for live fire training and aerial bombing, suggesting further that the Corps' use of the property did not rise to the level of a taking until November 20, 1989, the date on which the government received the estimate for cleaning up the property. With this statement, Catellus asks the court to approve of a subjective standard for knowing when a claim accrues, but the legal standard is clearly objective. The cause of action accrues when plaintiff should have known of its existence. *Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1577. Catellus ignores the fact that this same property was condemned by the Government in 1952–1958 by means of a lease and was used as an artillery and aircraft training area. Notwithstanding the remoteness of the property, as record owner Catellus should have been aware that its property was being hit with ordnance. *See Fulcher v. United States*, 696 F.2d 1073, 1077 (4th Cir.1982). The repeated bombing of an open space can hardly be considered a surreptitious act, and when the government engages in such open and notorious actions over a period of years, the landowner is on inquiry that it has a potential claim, and the statute of limitations begins to run. *Coastal Petroleum Co. v. United States*, 228 Ct.Cl. at 866. The materials before the court demonstrate that any taking claim asserted by Catellus based on live fire training and air and ground ordnance training accrued prior to July 24, 1985. Catellus has failed in its burden to persuade the court otherwise.

9. It is clear in this case that the government did not intend to take Catellus' property. The Marine Corps recognized it had no such authority to take this property. Generally, a Tucker Act claim does not lie for an executive taking not authorized by Congress, either expressly or by implication. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 126 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974). Indeed, it appears from the record that the mapping error was nothing but a mistake made by the government's map drafters. Perhaps this error was a by-product of the government's condemnation action against this property and related properties during the 50s when bombing first started. It is settled, though, that a taking occurs, and compensation as allowed by the Fifth Amendment must be paid, when there has been a *legal* action by the government. Illegal government actions do not result in takings. The record in this matter shows that the government had no right to bomb the land, and that the government bombed under no color of statute or regulation.

statute of limitations should not be tolled in this case.

## CONCLUSION

As the court stated in *LaMear*, on the present motion the facts must be found and analyzed to see whether plaintiff has met its burden of establishing by a preponderance of the evidence that the court may take jurisdiction over its claim. Notwithstanding the many papers submitted to the court, there is essentially no evidence that demonstrates just what has happened on Catellus' parcels of land in the past forty years. At oral argument it became apparent to the court that neither plaintiff nor defendant has any idea how much ordnance fell on the property, when the ordnance may have first fallen on the property, when such overfiring may have ceased, or whether any ordnance has indeed fallen on the property at all.

At oral argument, the court asked counsel for Catellus what evidence Catellus has presented to compel denial of the government's motion. Counsel referred to Lt. Colonel Taylor's "virtual certainty" letter and the government's representation in its answer that it has used property for bombardment in or around Lavic Lake at some point in 1985 or thereafter. But, Taylor's "virtual certainty" statement was prefaced by the admonition that the area in or around the subject property was used as a live fire training area "for years." Neither Catellus nor the government appears to have thoroughly investigated this property to determine how it may have been affected by the military's bombing activities nearby; neither party has presented the sort of evidence that would make this jurisdictional issue easier to resolve.[10] Furthermore, Catellus stated at oral argument that if this matter were to proceed to trial it would call as witnesses Lt. Colonel Taylor, lower-level Marine Corps personnel who gave estimates regarding clean-up costs, and the individuals who have already submitted affidavits with the court, and further enter into evidence the documents that comprise the record thus far. The government stated that if trial were held on the jurisdictional issue it would cross-examine Catellus' witnesses and. rely on the documentation presently before the court. The government assured the court it had made available to Catellus for discovery all pertinent materials in this regard. The court notes that even if it were to offer Catellus the benefit of the doubt in resolving this motion, it doesn't appear that facts would be developed at trial that haven't already been considered. As mentioned above, however, the parties seem to agree that there has been sufficient discovery to resolve the threshold issue of jurisdiction. It is a plaintiff's burden to proffer evidence establishing jurisdiction, a burden that in this case Catellus has not met.

For the reasons discussed above, defendant's motion to dismiss is *granted.* The Clerk is ordered to dismiss the complaint without prejudice. No costs.

It made a mistake. *Cf. Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 898–99 (Fed. Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) (no taking if the government has not been authorized to act). The court surmises that Catellus' claim, if there is a claim at all, may in fact be a due process claim, or sound in tort. *See Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802–03 (Fed.Cir.1993). *Cf. Bellamy v. United States,* 7 Cl.Ct. 720, 723 (1985) (plaintiff's complaint sounded in due process, thus no jurisdiction).

10. In his August 24, 1989 letter, Lt. Colonel Taylor advised that the Corps' Explosive Ordnance Disposal team had conducted periodic sweeps of the area, but that was only a mitigating action and in no way guaranteed that the danger has been abated. In 1984 such a sweep was conducted. The results of these sweeps apparently did not uncover any unexploded ordnance on Catellus' property, if indeed it swept Catellus' property. However, the Corps could not say with certainty that there was no unexploded ordnance on Catellus' sections.