Robert P. **CHIPPS**, Executor of the Estate of L.D. Chipps and the Estate of Mildred Chipps, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 431–88 L.

United States Claims Court.

Jan. 2, 1990.

Frank G. Simpson, III, Louisville, Ky., for plaintiff.

Beverly Sherman Nash, Washington, D.C., with whom was Richard B. Stewart, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

Lewis and Mildred Chipps, plaintiff's deceased parents, owned a 175–acre farm in Livingston County, Kentucky. The Chipps farm borders the Bayou Creek, a tributary of the Ohio River.

In 1978, the United States Corps of Engineers (the Corps) began constructing the Smithland Locks and Dam Project on the Ohio River downstream from the Chipps' farm. To account for the projected rise in water levels, the Corps sought a flowage easement of nine acres on plaintiff's land. When the Chipps refused its initial compensation offer, the Corps instituted a condemnation proceeding in federal district court. The Corps contended that $1,000.00 for each acre would be reasonable compensation. The jury, however, awarded Mr. and Mrs. Chipps $35,000.00 for the nine-acre easement.[1]

Lewis and Mildred Chipps brought this action in the United States Claims Court on July 22, 1988. Plaintiff now represents his deceased parents' estate in this action. Plaintiff claims that the Smithland Dam floods an additional 65 acres of the farm. Plaintiff seeks relief under the fifth amendment to the United States Constitution.

Defendant moves to dismiss plaintiff's complaint for lack of jurisdiction. Specifically, defendant contends that plaintiff did not file its complaint within the six-year statute of limitations. 28 U.S.C. § 2501 (1982). After oral argument, this court grants defendant's motion.

## FACTS

In 1978, the Corps began erecting the Smithland Locks and Dam on the Ohio River. The Corps expected the Smithland project to raise the normal water level of

---

1. Defendant suggested at a status conference in this action that the district court jury gave damages for more than nine acres. According to defendant, the 1984 proceeding contained numerous references to flooding beyond the nine acres at issue in the Kentucky District Court. Transcript of Proceedings, No. 431–88L, filed Dec. 23, 1988, at 15–16.

the Ohio River and its tributaries. According to the Corps' calculations, the dam would submerge nine acres of the Chipps farm. Therefore, the Corps sought a flowage easement along Bayou Creek on this property. Lewis and Mildred Chipps rejected defendant's initial offer of compensation.

In March 1979, the Corps filed a condemnation proceeding in the United States District Court for the Western District of Kentucky. *United States v. Tract 708E*, Civ. A. No. C79-0043P(J) (W.D.Ky.1979). After a trial on January 6, 1984, a jury awarded the Chipps $35,000.00 as just compensation for the easement. The district court entered judgment with interest on August 24, 1984.

The Corps finished the Smithland project in 1980. The water level of the Ohio River began to rise even before completion of the dam. By January 6, 1981, the Ohio River had risen 22 vertical feet to reach its new normal level.

The dam also raised the water level of Bayou Creek. This higher water level allegedly altered the capacity of the creek to absorb usual drainage demands. Plaintiff contends that an additional 65 acres of the Chipps farm has flooded on a recurring basis.

Bayou Creek's rising water levels affected plaintiff's property as early as 1979. During the 1984 condemnation proceeding, Dale Calendar—a contract farmer on plaintiff's land—testified about abnormal water conditions occurring as early as 1979. Mr. Calendar testified that increasing dampness forced him to stop planting 55 acres as early as 1979. Moreover Mr. Calendar had to adjust farming techniques on still more of plaintiff's land to account for soggy soil.

Flooding drastically affected farming operations on plaintiff's land from 1980 through 1985. The Chipps planted wheat in 1980 and soybeans in 1981. Flooding from Bayou Creek destroyed both crops. Similarly, the Chipps lost 50 acres of their wheat crop during both January and September of 1982 because of flooding. After flooding destroyed additional crops in 1984 and 1985, plaintiff stopped farming.

Lewis and Mildred Chipps, now deceased, filed this action in the Claims Court on July 22, 1988. On behalf of his parents' estate, plaintiff claims that the Smithland project has caused the recurring flooding of the Chipps's farm. This flooding, according to plaintiff, is a taking of property under the fifth amendment to the United States Constitution. Plaintiff seeks $252,720.00 as just compensation for the taking of 65 acres of land.

On July 24, 1989, defendant filed a motion to dismiss for lack of jurisdiction. Defendant contends that plaintiff did not file his claim within the six-year statute of limitations prescribed by 28 U.S.C. § 2501.

## DISCUSSION

Section 2501 of Title 28 sets forth the statute of limitations for actions in the Claims Court:

> Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

28 U.S.C. § 2501.

Statutes of limitations foster accuracy in the judicial process and give defendants repose from stale claims. The Supreme Court remarked:

> Statutes of limitations, which "are found and approved in all systems of enlightened jurisprudence," represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

*United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979) (citations omitted). These purposes are particularly applicable in the case at bar. Plaintiff's claim depends on the testimony of individuals familiar with the flooded land. Yet, the original plaintiffs and landowners are deceased.

If a plaintiff fails to file its claim within the period prescribed by a statute of limitations, this court lacks jurisdiction over the claim. *Kirby v. United States,* 201 Ct.Cl. 527, 539 (1973), *cert. denied,* 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974). When assessing its jurisdiction, this court must construe the facts in a light most favorable to plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The court may examine documents outside of the pleadings to establish the basis for jurisdiction. RUSCC 12(b); *see also, Illinois v. United States,* 15 Cl.Ct. 399 (1988). Using these standards to review defendant's statute of limitations defense, this court finds that it lacks jurisdiction over plaintiff's claim.

### Computing the Limitations Period—Takings Claim

█ Section 2501 requires this court to find out when plaintiff's cause of action fully accrued. From that point forward, plaintiff has six years in which to file his claim. A cause of action accrues when all events necessary to establish liability have occurred. *Sellick v. United States,* 222 Ct.Cl. 679, 680, 650 F.2d 285 (1980); *Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States,* 178 Ct.Cl. 630, 632, 373 F.2d 356, *cert. denied,* 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). A claim cannot accrue until the claimant suffers damage. *Terteling v. United States,* 167 Ct.Cl. 331, 338, 334 F.2d 250, 254 (1964).

The United States Court of Claims first decided that a takings claim for flooding accrues when the Government begins operating the dam or other structure at a new, higher water level. *Court of Marion County, W. Va. v. United States,* 53 Ct.Cl. 120, 146 (1918). The court reasoned:

> The idea of a taking seems necessarily to embody in its very nature a specific act which must have occurred at a time definitely to be ascertained. Such is the ordinary significance of the term, and it is inconsistent with the idea that the specific act is to be supplemented by some indefinite and problematic contingency.

*Id.* at 146.

*Marion County* rejected the proposition that a taking accrues only after the plaintiff fully ascertains the consequences of Government action:

> To apply [this approach] to this case is to assume that the plaintiff might ... at its own pleasure select the time when it should conclude that the damages ... "amounted to a taking" and that a cause of action therefore had accrued. A cause of action must arise out of some act or omission of the party to be charged and it is a perversion of usual rules to inject into it any element of personal selection....

*Id.* at 149. Following this reasoning, the Court of Claims held that the taking accrued when the pool behind the dam reached its new level. *Id.* at 150.

Unlike the Court of Claims in *Marion County,* the Supreme Court has refused to identify a firm and easily administered cut-off date for accrual of a takings claim. *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). In *Dickinson,* a property owner sued the Government under the takings clause for flooding and erosion that resulted from the construction of a nearby dam. The Government moved to dismiss for failure to meet the applicable statute of limitations. The Government contended that a taking accrued either when the dam began to impound water or when the land was flooded for the first time.

In denying the Government's motion, the Supreme Court rejected firm deadlines for setting the accrual date. The Court observed that identifying a particular event as the benchmark for accrual would defeat the purpose of the Just Compensation clause:

The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die.

*Dickinson*, 331 U.S. at 748, 67 S.Ct. at 1385.

The Supreme Court reasoned that Government appropriation by flooding is gradual and therefore cannot be identified by the occurrence of a single event. Justice Frankfurter explained:

If suit must be brought, lest he [plaintiff] jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of *res judicata* against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck.

*Dickinson*, 331 U.S. at 749, 67 S.Ct. at 1385.

Consistent with the concerns expressed by the Supreme Court in *Dickinson*, the Court of Claims departed from the *Marion County* standard. The court instead adopted and applied a foreseeability standard to determine when a taking cause of action accrues. *Nadler Foundry & Mach. Co. v. United States*, 143 Ct.Cl. 92, 164 F.Supp. 249 (1958); *Duane Barnes v. United States*, 210 Ct.Cl. 467, 538 F.2d 865 (1976).

In *Nadler*, a property owner sought just compensation for flooding caused by Government dredging operations. Between 1926 and 1934, dredging operations gradually raised the river's water line. In 1934, the rising water caused an extensive cave-in on the property owner's land. The riverbank continued to collapse periodically until 1951, at which time the property owner demanded that the Government install necessary protections. The Government refused and the property owner proceeded to erect his own protections. The property owner instituted a takings action in 1954.

The Government moved to dismiss for failure to file within the applicable six-year limitations period. The Court of Claims granted the motion, reasoning that: "[W]hen, before 1934, the water had practically reached the bottom of the steep bank ... the ultimate cave-in of that land *was a foreseeable event.*" *Nadler*, 164 F.Supp. at 251 (emphasis added).

Similarly, in *Duane Barnes*, 538 F.2d at 865, a landowner sought compensation from the Government for flooding caused by a nearby dam. The property at issue experienced unusual flooding in 1969 and 1970. From 1971 through 1973, flood conditions and an increased water table ruined crops and rendered pastureland useless.

Though *Duane Barnes* did not raise a statute of limitations question, the Court of Claims did identify when the taking accrued for purposes of calculating damages. The Government contended that the taking claim accrued when the first flood occurred in 1969. The property owner argued that the taking accrued in 1973, after experiencing several floods and various instances of crop damage. The Court of Claims determined that the taking accrued in 1973. Based on *Dickinson*, the court reasoned:

Adopting a date of taking must often be done in a somewhat imprecise manner, this aspect of the cases being in the nature of a jury verdict. [citation omitted]. The date selected obviously depends on the facts of each case, but the facts here lead us to the firm conclusion that the date the Government completed taking its flowage easement cannot be prior to when, through passage of time, the permanent character of intermittent flooding could fairly be perceived.

*Barnes,* 538 F.2d at 873. Thus, the taking accrued when the landowner was first able to foresee the permanency of the Government's appropriation.

The United States Court of Appeals for the Federal Circuit has continued to follow this rule. Clarifying the standard for accrual, the Federal Circuit stated:

> The point at which the taking becomes sufficiently certain to give rise to a claim for compensation varies in each case.

*J.R. Cooper v. United States,* 827 F.2d 762, 764 (Fed.Cir.1987). Thus, the Federal Circuit's foreseeability standard depends on the facts of each case.

This foreseeability standard takes into account the unique facts of each case. Different types of flood damage become noticeable at different times. For example, while total submersion or destruction of crops occurs immediately, erosion and rising water tables are conditions that may develop over years:

> [I]n cases in which it is alleged that dams are causing flooding alone, which results in a taking, utilization of the date of complete impoundment may be appropriate. However, in a case ... in which erosion damage is claimed, the erosion may be more gradual and the effects not as readily apparent as would be the case with continuous flooding.

*Baskett v. United States,* 8 Cl.Ct. 201, 230 (1985), *aff'd,* 790 F.2d 93 (Fed.Cir.), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986).

The Court of Claims, however, qualified the foreseeability standard in two important respects. First, a taking claim may accrue before all possible flood damage has occurred. *Nadler,* 164 F.Supp. at 251; *Columbia Basin Orchard v. United States,* 116 Ct.Cl. 348, 357, 88 F.Supp. 738, 739 (1950). Second, the number of floods that has occurred is not a revealing factor in deciding when a claim accrued:

> [T]he courts have held that one, two or three floodings by themselves do not constitute a taking. The plaintiff must establish that flooding will 'inevitably recur'....

*National By–Products, Inc. v. United States,* 186 Ct.Cl. 546, 576, 405 F.2d 1256, 1273 (1969).

In the instant action, defendant contends that plaintiff's claim accrued when the Ohio River reached its maximum level in January 1981 (complete impoundment). Plaintiff asserts that its claim did not accrue until an intermittent but recurring flood pattern allegedly became apparent.

No particular event automatically signals the accrual of a takings action. Rather, this court must apply a foreseeability standard to determine the accrual date. Thus, this court will review the totality of circumstances from 1979 through 1982 to decide whether plaintiff could foresee a permanent invasion of its property either at the time of complete impoundment or upon recurring flood patterns. This inquiry must consider all aspects of the record, including testimony at the 1984 condemnation proceeding.

*Complete Impoundment*

As discussed earlier, the Court of Claims abandoned the mechanical application of the date of complete impoundment to establish the accrual point in flooding cases. The complete impoundment date, however, may apply in cases where the plaintiff admits the taking occurred at that time. Complete impoundment may also mark the accrual time in cases where the evidence indicates that permanent damage was foreseeable from that time forward. The case at bar presents both of these reasons for application of the complete impoundment date.

Plaintiff complained that the rising Bayou Creek "caused *immediate and recognizable overflow* of certain contiguous lands...." Plaintiff's First Amended Complaint, filed Nov. 28, 1988, (Pl.Am. Comp.) at ¶ 9 (emphasis added). Plaintiff's complaint suggests immediate recognition that the new water levels caused overflows.

Plaintiff confirmed in its response to interrogatories that the taking first occurred at the time of complete impoundment:

INTERROGATORY NO. 16:

On what date do you contend your property was taken.

RESPONSE: Upon the establishment of the new higher pool level, date unknown.

Defendant's Motion to Dismiss, filed July 24, 1989 (Def. Mot. to Dis.), at Exhibit (Ex.) B. Thus, plaintiff admitted that the complete impoundment date accurately established the time when it could foresee the consequences of the Government's invasion.

Defendant introduced the affidavit of Laurence Curry, a Corps hydraulics engineer, to show that the pool level of the Ohio River reached its new peak on January 6, 1981. Mr. Curry stated:

That official data from the Weather Data Gage and Operations Logs indicates that on January 6, 1981, the level of the Ohio River had been elevated 22 feet and reached its new permanent pool....

Def. Mot. to Dis., at Ex. A, ¶ 6. Plaintiff does not challenge the affidavit of Mr. Curry. Complete impoundment occurred on January 6, 1981—seven and one-half years before plaintiff filed suit.

Furthermore, testimony during the 1984 condemnation proceeding suggests that flood conditions noticeably diminished the value of plaintiff's farm as early as 1979, two years before complete impoundment. Plaintiff's counsel and Dale Calendar engaged in the following exchange:

Q. Since 1979, I want to ask you, number one, the methods that you have had to employ on this farm, have they changed any, your farming methods?

A. Yes. I can't farm the whole field as one farm now. I have a lot more turning to do and a lot of point rows, and a lot more places I have to pull around.

Q. I wonder if you could ... I would like for you to explain to the jury exactly what problems you are running into now.

A. Well now all of this area right in here is real wet and stays wet a lot longer than the rest of the field, and so forth, and lots of time when I go into the field to start fixing the ground....

Q. And you used to plant 135 acres but you are only planting 80 this time?

A. Yes.

Q. The less acres you plant, the less money you make. Is that right, Mr. Calendar?

A. Yes.

....

Q. If a farmer were.... If this farm were to be put on the market as of January 20, 1979 after the taking, after the impoundment of the dam, after the water had come up, in your opinion would the farm as a whole have been devalued, be worthless?

A. Did you say after the dam?

Q. Afterwards.

A. Yes, it would be worth considerably less to me.

Reply Memorandum of Law in Support of Defendant's Motion to Dismiss, filed Aug. 28, 1989 (Def. Reply), at Ex. F.

In this exchange, plaintiff's counsel suggested January 20, 1979 as the date injury began to occur. Mr. Calendar testified to damage beginning at that early date. Complete impoundment occurred nearly two years and several growing seasons later on January 6, 1981. By this complete impoundment date, plaintiff had endured several more flooded growing seasons. Plaintiff knew or should have known by the complete impoundment date that the dam had permanently harmed the land.

Under the foreseeability test, therefore, plaintiff's cause of action on the contested 65 acres accrued in January 1981. Consequently, plaintiff's July 1988 filing missed the six-year limitations period of 28 U.S.C. § 2501 by over one and one-half years.

*Intermittent but Inevitably Recurring Flooding*

■ Notwithstanding its answers to interrogatories, plaintiff now contends that the Government taking fully accrued at the time of intermittent but recurring flooding, not at the time of complete impoundment. Plaintiff asserted for purposes of opposing defendant's motion that it first noticed this recurring flood pattern in 1984 or 1985. Even if this court accepts plaintiff's contention that the taking became foreseeable at the time of recurring flooding, plaintiff knew or should have known of a recurring

flood pattern before 1982. Consequently, plaintiff's action would not be timely whether the court identified complete impoundment or recurring flooding as the date of foreseeability.

In cases where a plaintiff alleges erosion damage after repeated flooding, courts still follow the foreseeability standard. *See, e.g., Dickinson,* 331 U.S. at 747, 749, 67 S.Ct. at 1384, 1385; *Baskett,* 8 Cl.Ct. at 230–31. These cases recognize the difference between inundation damage and erosion damage. Inundation is immediately detectable. Erosion is a gradual process that typically becomes noticeable only after several floods. Consequently, the actual magnitude of erosion damage may not be calculable until several years after the onset of recurring flooding. *Id.* at 230.

In the case at bar, plaintiff claims inundation reduced the value and use of the property. This flooding, unlike erosion, caused "immediate and recognizable" damage. Pl. Am. Comp., at ¶ 9. In the case at bar, the flooding immediately destroyed crops.

Excessive dampness caused Mr. Calendar to change farming techniques as early as 1979. Plaintiff who stated that flooding destroyed crops in 1980, 1981, and January 1982. Under these circumstances, plaintiff could have foreseen permanent damage before 1982. Plaintiff lost several crops on the contested 65 additional acres before 1982.

Plaintiff's allegations show that he knew, or should have known, before 1982, that Smithland Dam would cause recurring flooding of the farm. Plaintiff has repeatedly contended that flooding destroyed crops as early as 1980. This court first discussed the recurring pattern of floods at a status conference held November 22, 1988:

> THE COURT: If I understand correctly, the land in question ... was flooded for the first time in 1984, is that correct, just before the 1985 ruling?
>
> [PLAINTIFF'S COUNSEL]: Your Honor, actually the information we have is that acreage, crop land started being lost

in that area starting around 1980. A crop was lost in '80, '81 and '82.

> THE COURT: Now the crop, what caused the actual loss of the crops?
>
> [PLAINTIFF'S COUNSEL]: The crops were lost by the process of this overflow from Bayou Creek sitting upon this acreage of land from anywhere between five and seven days at a time.

Transcript of Proceedings, No. 431–88L, filed Dec. 23, 1988, at 8–9.

Plaintiff reiterated this recurring flood pattern at another status conference held June 20, 1989. The following exchange occurred between this court and plaintiff's counsel:

> THE COURT: I think we're talking about 1985 here aren't we?
>
> MR. SIMPSON: Well the properties were consistently flooded from '80, '81 up to '85 or they were planted from '81 up to '85 and then crops quit being planted but the property kept being flooded....

Transcript of Proceedings, No. 431–88L, filed July 18, 1989, at 30–31.

Consistent with these statements, Robert Chipps's answers to defendant's interrogatories reveal that Bayou Creek flooding consistently destroyed crops in 1980, 1981, and 1982. In response to defendant's inquiry about crops planted on the farm after the Ohio River reached its peak level, Robert Chipps stated:

> The crops on the property were as follows:
>
> 1980—wheat,
> 1981—soybeans,
> 1982—soybeans,
> 1983—none,
> 1984—soy beans
> 1985—milo,
> ....
> 1989—none.
>
> Plaintiff presently has no information regarding yield or value of the before mentioned crops, except to state that all crops mentioned above were destroyed during the flooding previously described.

Def. Mot. to Dis., at Ex. C.

Plaintiff now contends, however, that it inaccurately answered these interrogato-

ries. Accordingly, plaintiff asks this court to disregard these responses. The record nevertheless supports plaintiff's original responses. Testimony from the 1984 condemnation proceeding shows a recognizable pattern of recurring flooding began in 1979 and 1980. For instance, Mr. Calendar testified about flood damage dating back to 1979. Counsel for plaintiff has represented on at least two occasions that flood damage occurred in 1980, 1981, and January 1982. Moreover, other testimony from the 1984 proceeding, including Mr. Curry's entire testimony, show damage beginning long before 1982.

In sum, the record demonstrates that intermittent but recurring flooding occurred before 1982. Plaintiff had every reason to foresee this permanent condition of recurring flooding before 1982. Plaintiff's takings claim therefore first accrued before January 1982. Plaintiff's July 22, 1988 filing did not meet the six-year limitations period.

## CONCLUSION

Based on plaintiff's statements and an examination of the record, plaintiff's cause of action first accrued before 1982. Plaintiff filed its takings claim on July 22, 1988. Thus, plaintiff failed to satisfy the six-year statute of limitations prescribed by 28 U.S.C. § 2501.

This court grants defendant's motion to dismiss and directs the Clerk to enter judgment dismissing plaintiff's first amended complaint.

No costs.