Charles McDONALD, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 92–116L, 92–367L.

United States Court of Federal Claims.

Jan. 2, 1997.

Kenneth L. Riche, Baton Rouge, LA, attorney of record, for plaintiffs. Riche & Wall, of counsel.

Stuart B. Schoenburg, Department of Justice, Washington, DC, for defendant.

## OPINION

FUTEY, Judge.

This case is before the court on defendant's motion to dismiss plaintiffs' consolidated cases for lack of jurisdiction pursuant to RCFC 12(b)(1). Defendant argues that plaintiffs' alleged taking causes of actions are time-barred under the applicable statute of limitations. Plaintiffs maintain that they timely filed their complaints.

### Factual Background

Plaintiffs, Charles G. McDonald (plaintiff McDonald); and David N. Crawford, John A. Crawford, Robert V. Crawford, A. Lambert Voorhies, and Mireille V. Martin (collectively plaintiffs Crawford), own adjacent lands in St. Landry Parish, Louisiana. Plaintiff McDonald owns approximately 1,740 acres of

land and plaintiffs Crawford own about 400 acres. Plaintiffs' properties, which are contiguous to the Little Darbonne Bayou, lie above the normal high-water mark of all adjacent navigable streams.

Since the 1930s, defendant, acting through the Army Corps of Engineers, has been engaged in projects involving waterways near plaintiffs' properties. In the 1980s, defendant constructed the Teche–Vermilion Basins, Louisiana Project, and, more particularly, the Teche–Vermilion Basins Fresh Water Supply Project (the project). The project was designed to increase the flow of water in the area around plaintiffs' properties by pumping water from the Atchafalaya River, through interconnected man-made canals and natural bayous, into Bayou–Teche. Defendant states that it undertook the project to restore the naturally-occurring water flow that had existed prior to defendant's construction of two levees in the area in the 1930s. Plaintiffs claim that defendant caused the water levels to rise by reversing the natural flow of water in Bayou Courtableau and other bayous bordering plaintiffs' properties. The additional water was needed, among other reasons, to counteract salt water intrusion into Bayou Teche.

Under a contract with defendant, a local sponsor, the Teche–Vermilion Freshwater District (the District), agreed to provide all land, easements, and rights-of-way for the project, as well as to hold defendant harmless. Upon completion of the project in December 1982, the District took control of the project's operations. Since that time, the project has maintained water elevations of sixteen feet in December, seventeen feet in January and February, and eighteen feet from March through November.[1]

According to plaintiffs, the artificial water levels created by the project are higher than the natural and historical water levels in the area. Plaintiffs assert that, as a result of these higher water levels, previously dry land is now permanently flooded and natural rainwater cannot properly drain from plaintiffs' properties. Plaintiffs further contend that

the increased water levels in the bayous created seepage through the ground, which raised the water table in the area and further inhibited the natural drainage patterns of the land. Plaintiffs allege that defendant has not acquired flowage easements over the land in question by condemnation or eminent domain.

Plaintiff McDonald filed his complaint in this court on February 18, 1992. Plaintiff McDonald claims that, since the completion of the project: (1) three hundred acres of land used for farming is covered in water a substantial portion of each year such that it is no longer of any reasonable use; (2) an additional five hundred acres of crop land can be drained, but the cost of operating drainage pumps prevents the land from having any economical use; and (3) two hundred acres of land used for growing timber is submerged causing the standing timber to die and preventing the growth of new trees. Based upon these contentions, plaintiff McDonald claims that defendant is liable to him for a taking of his property under the Fifth Amendment to the United States Constitution. Plaintiff McDonald requests at least $700,000 in damages for the fair market value loss of the land, loss of income from the land's fair rental value, loss of standing timber, and loss of income from future timber growth. In addition, plaintiff McDonald asks for interest, attorney fees, and costs. The McDonald complaint does not identify a specific date for the alleged taking but rather asserts that the alleged taking occurred "[a]fter completion of the project."[2]

Plaintiffs Crawford filed their complaint in this court on May 22, 1992. In their complaint, plaintiffs Crawford state that, prior to the completion of the project, their land was used for growing timber, hunting, and other recreational activities. As a direct result of the project, their property is now covered in water a substantial portion of each year such that: (1) the property is no longer of any reasonable use; and (2) the standing timber is dying and the future growth of new trees is impossible. Plaintiffs Crawford allege that

---

1. The only exception came during an extremely dry period in the summer of 1988, when the water level fell to seventeen feet.

2. McDonald Complaint at 3 (McDonald Compl.).

defendant is liable to them for a taking of their property under the Fifth Amendment. They request damages in the amount of at least $200,000 for the fair market value loss of their land, loss of standing timber, and loss of income from future timber growth. Plaintiffs Crawford also ask for interest, attorney fees, and costs. The Crawford complaint, like the McDonald complaint, states only that the alleged taking occurred "[a]fter completion of the project." [3]

On June 18, 1993, the actions of plaintiff McDonald and plaintiffs Crawford were consolidated by order of the court. The parties and the court then proceeded with the case in anticipation of trial. Based upon information uncovered during discovery, defendant filed a motion to dismiss both complaints on May 8, 1996.

### Discussion

Plaintiffs bring their taking claims against defendant pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994). Actions brought under the Tucker Act are time-barred if they are not filed within six years of the date the cause of action accrued. 28 U.S.C. § 2501 (1994). The court's six-year statute of limitations is a jurisdictional requirement, which must be strictly construed. *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994); *see also Bear Claw Tribe, Inc. v. United States*, 36 Fed.Cl. 181, 187 (1996) (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988)). Moreover, because the statute of limitations is jurisdictional, a plaintiff bears the burden of proving that its action was timely filed. *Mason v. United States*, 27 Fed.Cl. 832, 836 (1993). The court may not waive the statute of limitations. *Laughlin v. United States*, 22 Cl.Ct. 85, 99 (1990), *aff'd mem.*, 975 F.2d 869 (Fed.Cir.1992). In sum, a plaintiff's failure to comply with the statute of limitations "places the claim beyond the court's power to hear and decide." *Catellus*, 31 Fed.Cl. at 404.

Arguing that plaintiffs filed their complaints more than six years after their causes

of action had accrued, defendant asks the court to dismiss both complaints as being beyond the court's jurisdiction. Defendant asserts that, because "[t]he new regimen of water levels instituted in December 1982, stabilized in 1983, and continued thereafter," [4] plaintiffs knew or should have known of the new flooding regimen from at least 1983. Defendant further argues that all of the alleged interferences with plaintiffs' properties, with the possible exception of the damage to trees, would have occurred as an immediate and open result of the flooding.

In ruling on a motion to dismiss for lack of jurisdiction under RCFC 12(b)(1), the court must accept as true the complaint's undisputed factual allegations and construe the facts in the light most favorable to plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also Hamlet v. United States*, 873 F.2d 1414, 1415 (Fed.Cir.1989); *Farmers Grain Co. v. United States*, 29 Fed.Cl. 684, 686 (1993). A plaintiff must make only a *prima facie* showing of jurisdictional facts through the submitted material in order to avoid a defendant's motion to dismiss. *See Raymark Indus. v. United States*, 15 Cl.Ct. 334, 338 (1988) (citing *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977)). If the undisputed facts reveal any possible basis on which the non-moving party might prevail, the court must deny the motion. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *see also Lewis v. United States*, 32 Fed.Cl. 59, 62 (1994). If, however, the motion challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence in order to resolve the factual dispute. *See Rocovich v. United States*, 933 F.2d 991, 994 (Fed.Cir.1991); *see also Lewis*, 32 Fed. Cl. at 62. In accordance with these considerations, the court must determine whether plaintiffs have made a *prima facie* showing that they filed their complaints within six years of the dates of accrual of their causes of action.

---

3. Crawford Complaint at 3 (Crawford Compl.).

4. Motion of the United States to Dismiss the Complaints of All of the Plaintiffs at 14 (citation omitted) (Def.'s Mot.); *see also Id.*, Ex. 1 at 5.

■ Determining when a taking cause of action accrues is a fact-specific endeavor that "must often be done in a somewhat imprecise manner, this aspect of [taking] cases being in the nature of a jury verdict." *Barnes v. United States*, 210 Ct.Cl. 467, 538 F.2d 865, 873 (1976); *see also Catellus*, 31 Fed.Cl. at 404. Generally, a taking cause of action first accrues when "all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland Band*, 855 F.2d at 1577; *see also Japanese War Notes Claimants Ass'n v. United States*, 178 Ct.Cl. 630, 373 F.2d 356, 358, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). The court determines whether the pertinent events have occurred under an objective standard. *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed.Cir. 1995), *cert. denied*, — U.S. —, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996). Accordingly, a plaintiff need not possess actual knowledge of all relevant facts in order for a cause of action to accrue. *Id.*

■ In *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), the United States Supreme Court refused to identify firm deadlines for setting the accrual date of a taking cause of action. The *Dickinson* court held that, when the defendant allows a taking of land to occur by a continuing process of physical events, a plaintiff may postpone filing suit until the nature and extent of the taking is clear. *Id.* at 749, 67 S.Ct. at 1385. The Court determined that, in cases involving intermittent flooding, a plaintiff's cause of action does not accrue until "the situation becomes stabilized." *Id.* Stated differently, a plaintiff in such cases may postpone filing suit until "the consequences of inundation have so manifested themselves that a final account may be struck." *Id.* A plaintiff may not, however, wait to bring a cause of action "until any possibility of further damage ha[s] been removed." *Columbia Basin Orchard v. United States*, 116 Ct.Cl. 348, 88 F.Supp. 738, 739 (1950). Rather, the accrual of a plaintiff's cause of action depends upon the foreseeability of damage caused by the defendant's activities. *Baskett v. United States*, 8 Cl.Ct. 201, 231 (1985) (citing *Nadler Foundry & Mach. Co. v. Unit-*

*ed States*, 143 Ct.Cl. 92, 164 F.Supp. 249, 251 (1958)), *aff'd mem.*, 790 F.2d 93 (Fed.Cir.), *cert. denied*, 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986).

Citing to *Dickinson*, the Court of Claims determined, in *Barnes*, that the plaintiff's cause of action for a taking by intermittent flooding accrued "when the permanent character of intermittent flooding could fairly be perceived." *Barnes*, 538 F.2d at 873. Subsequently, the Claims Court applied the foreseeability standard in determining the date of accrual in flooding cases where erosion damage is claimed. *Baskett*, 8 Cl.Ct. at 231. The court held that, in such cases, the statute of limitations begins to run "when the damage (1) manifested itself so that it should have been recognized, (2) the circumstances were such that the damage was a foreseeable future event, or (3) that the alleged effects of the [defendant's] actions were fully known by the landowners." *Id.* The court also opined, however, that utilization of the date of complete impoundment may be appropriate in cases alleging a taking by flooding alone where the effects would be more readily apparent. *Id.* at 230.

In *Chipps v. United States*, 19 Cl.Ct. 201, *aff'd mem.*, 915 F.2d 1585 (Fed.Cir.1990), the Claims Court further explained the distinction between cases involving erosion damage and cases involving inundation. Initially, the court noted that "[d]ifferent types of flood damage become noticeable at different times." *Id.* at 205. The court continued:

In cases where a plaintiff alleges erosion damage after repeated flooding, courts still follow the foreseeability standard. These cases recognize the difference between inundation damage and erosion damage. Inundation is immediately detectable. Erosion is a gradual process that typically becomes noticeable only after several floods.

*Id.* at 207. Thus, causes of action for different types of flood damage may accrue at different times. *Id.*

■ Here, both plaintiff McDonald and plaintiffs Crawford put forth, and seek compensation for, two arguably distinct claims: (1) the fair market value loss of land due to

defendant's flowage easement; and (2) the loss of standing timber and loss of income from future timber growth.[5] It is clear from their complaints that plaintiffs are alleging the taking of flowage easements relating to their claims for fair market value loss of their lands. Their claims for the loss of timber, however, are not necessarily predicated on the taking of flowage easements. Although the timber at issue was standing on the land for which plaintiffs seek to show a reduction in fair market value, plaintiffs' timber-related claims represent separate causes of action within the meaning of *Cooper v. United States*, 827 F.2d 762, 764 (Fed.Cir. 1987).

In *Cooper*, the United States Court of Appeals for the Federal Circuit allowed recovery for timber, independent of the land, where the timber was destroyed by standing water. In fact, the Federal Circuit held that the trial court erred in treating the taking at issue as a taking of a temporary flowage easement rather than as a taking of trees. *Id.* at 763. In reaching this conclusion, the Federal Circuit stated that, "although the government may have taken a flowage easement, the plaintiff does not seek compensation for it.... [Instead, the plaintiff] claims compensation for the destruction of timber caused by flooding." *Id.* The Federal Circuit also noted that the plaintiff's claim for the destruction of timber was not predicated upon the taking of a flowage easement. *Id.* Based upon these determinations, the Federal Circuit concluded that the plaintiff's case was not controlled by cases dealing with flowage easements. *Id.* The Federal Circuit then went on to discuss the accrual of a plaintiff's cause of action for a taking of timber by flooding. *Id.* at 763–64.

Before setting out the test for the accrual of such a cause of action, the Federal Circuit reiterated the general principle that, in cases involving the taking of property by flooding, the date of accrual of a plaintiff's cause of action is determined with regard to when the flooding became sufficiently stabilized so that

the plaintiff could ascertain what land had been taken. *Id.* at 764 (citing *Dickinson*, 331 U.S. at 749, 67 S.Ct. at 1385). In cases involving the taking of timber by flooding, however, the Federal Circuit stated that the critical time is the date upon which the destruction of trees became sufficiently stabilized so that the plaintiff could determine the amount of timber taken. *Id.* Although flood water is the operative force in both types of cases, "it operates differently, and at different times, to cause a taking of land by inundation, or a taking of timber by suffocation. The point at which the taking becomes sufficiently certain to give rise to a claim for compensation varies in each case." *Id.*

██ Under these terms and depending upon the unique facts of each case, a cause of action may not accrue merely upon the stabilization of a new water regimen. Rather, the accrual of a cause of action is dependent upon the stabilization of the flooding and its consequent effects upon a plaintiff's property. Thus, in the present case, the fact that the water regimen became stabilized in 1983 does not necessarily lead to the conclusion that the flooding was sufficiently stabilized in 1983 for plaintiffs to ascertain what had been taken.[6] Indeed, defendant admits that, while most of the alleged interferences with the use of plaintiffs' properties would have occurred as an immediate and open result of inundation as early as 1983, the trees on plaintiffs' properties would not have died immediately but rather would have first become stressed.

In determining the dates of accrual of plaintiffs' causes of action, this court therefore examines separately: (1) the alleged interference with the agricultural use of plaintiff McDonald's property; (2) the alleged damage to timber on plaintiff McDonald's property; (3) the alleged interference with the recreational uses of plaintiffs Crawford's property; and (4) the alleged damage to timber on plaintiffs Crawford's property. Further, because plaintiff McDonald and

---

5. McDonald Compl. at 4–5; Crawford Compl. at 3–4.

6. Reynold D. Broussard, an hydraulic engineer with the Corps of Engineers who worked on the project, also states only that the water regimen stabilized in 1983. He says nothing regarding the stabilization of the flooding or its effects upon plaintiffs' properties.

**116**

plaintiffs Crawford filed their complaints on different dates, the relevant period for computing the six-year statute of limitations is different for each complaint.

 The court also notes, however, that the primary basis for defendant's motion to dismiss both complaints is a letter dated February 17, 1986, from Mr. David L. Williams of Louisiana Southern Forest Products, Inc. to plaintiff Robert V. Crawford.[7] In the letter, Mr. Williams states:

[A]s you are aware, we have been unable to harvest any timber from these lands for many months due to the high water table and soft ground conditions. . . . [C]ontinual submergence in water will kill timber. My estimate is that the water has already damaged your timber such that it probably would not recover even if the water were removed.[8]

Although plaintiff McDonald contends that the court should not apply Mr. Williams' letter to his claim, the court is satisfied that any stress visible on the timber located on plaintiffs Crawford's property also would have been visible on the timber located on plaintiff McDonald's property "due to the close proximity of the parcels to each other, and the similar geographic conditions of each."[9] Thus, the court may fairly impute Mr. Williams' statements to plaintiff McDonald's timber, as well as plaintiffs Crawford's timber.

 In addition, under the objective standard described in *Fallini*, plaintiffs' status as absentee land owners has no bearing on the court's disposition of defendant's motion. "It is fair to charge a property owner with knowledge of what happens on his land." *Catellus*, 31 Fed.Cl. at 408. Thus, the court must ask not whether plaintiffs actually knew of the damage to their properties but rather whether "the essence of [their] claim[s] could have been discovered with the type of inquiry expected of a diligent property owner." *Id.* That question is

to be answered based upon the facts of each case. *Barnes*, 538 F.2d at 873.

### I. *McDonald Complaint*

Plaintiff McDonald filed his complaint in this court on February 18, 1992. Accordingly, his cause of action must have accrued on or after February 18, 1986, to fall within the applicable six-year statute of limitations.

#### A. *Destruction of plaintiff McDonald's crop land*

 The court first considers plaintiff McDonald's claim for the taking of eight hundred acres of crop land previously used for growing rice. With regard to that claim, the McDonald complaint states: "[a]fter completion of the project, and as a direct result of the project, [eight hundred acres of plaintiff McDonald's crop land] is covered in water a substantial portion of each year such that it is no longer of any reasonable [or economically-viable] use."[10] It is undisputed that the project was completed in 1982 and that the resultant water levels have remained constant since 1983. As did the plaintiff's complaint in *Chipps*, plaintiff McDonald's complaint "suggests immediate recognition that the new water levels caused [damage]." *Chipps*, 19 Cl.Ct. at 205. Moreover, plaintiffs' memorandum in opposition to defendant's motion to dismiss states:

With the advent of the Project, the natural drainage patterns of the properties have been altered and the affected portions of Plaintiffs' properties remain virtually underwater throughout the year. This constant inundation of water prevents planting and harvesting of crops and the growth of new timber, kills existing timber, and limits the recreational uses of the lands.[11]

Like the McDonald complaint, this statement indicates that the damage to plaintiff McDonald's crop land was immediately appar-

---

7. At that time, Louisiana Southern Forest Products, Inc. owned a timber lease on plaintiffs Crawford's property.

8. Def.'s Mot., Ex. 5 at 3.

9. *Id.*, Ex. 2 at 2.

10. McDonald Compl. at 3–4.

11. Plaintiffs' Memorandum in Opposition to the Motion of the United States to Dismiss the Complaints of All of the Plaintiffs at 3 (Pls.' Opp.).

ent, or at least foreseeable, upon stabilization of the new water regimen, which the parties agree occurred in 1983.

The above-quoted statement further shows that the present case involves inundation caused by a permanent regimen of water levels rather than intermittent flooding. Beyond confirming that there has been constant inundation since the advent of the project, the statement also reveals that plaintiffs' properties have remained virtually underwater since that time. Case law suggests that use of the date of complete impoundment as the date of accrual may be appropriate in such cases. *Baskett,* 8 Cl.Ct. at 230; *see also Chipps,* 19 Cl.Ct. at 207. Under this theory, plaintiff McDonald's cause of action for a taking of his crop land would have accrued in 1983.

The same conclusion results if the court applies the foreseeability standard to determine the date of accrual of plaintiff McDonald's cause of action. The relevant inquiry under this test asks when the circumstances were such that the damage to plaintiff McDonald's crop land became foreseeable. *Baskett,* 8 Cl.Ct. at 231. Based upon plaintiff McDonald's complaint and plaintiffs' memorandum in opposition to defendant's motion, it is clear to the court that the circumstances were such that the damage to plaintiff McDonald's crop land was foreseeable after stabilization of the new water levels in 1983. More specifically, the filings indicate that, since the project was completed in 1983: (1) plaintiff McDonald's property is under water a "substantial portion of each year;"[12] and (2) the inundation is "constant."[13] The continuous nature of the submergence of plaintiff's property indicates that plaintiff McDonald, at the very least, should have known that his crop land would be damaged. Nothing more was required for plaintiff McDonald's cause of action to accrue. *Fallini,* 56 F.3d at 1380; *see also Hopland Band,* 855 F.2d at 1577. The court's decision is, therefore, unaffected by plaintiff Mc-

Donald's contention that he was not put on notice of possible damage to his property until early 1988, when a tenant farmer informed him of problems in draining rice fields.

In any event, it is clear that the situation on plaintiff McDonald's property was sufficiently stabilized such that he could have ascertained what crop land had been taken well before February 18, 1986. Plaintiff McDonald's claim for fair market value loss of his crop land and lost income from the land's fair rental value is time-barred.

### B. *Damage to plaintiff McDonald's timber*

■ Defendant admits that trees on plaintiffs' properties would not have immediately died but would first have become stressed. Defendant's expert on trees, Mr. Robert W. LaFleur, states that, upon inspection of plaintiffs' properties, he observed several species of timber that are prevalent in the region, including: (1) Nuttall Oak; (2) Overcup Oak; (3) Green Ash; (4) Bald Cypress; (5) Water Locust; and (6) Water Hickory. Mr. LaFleur opines that stress on the Nuttall Oaks would have been noticeable on both the McDonald and Crawford properties in 1984 or 1985. Mr. LaFleur further states that any stress on other timber species would have become visible in 1985 to 1987. In addition, plaintiffs' expert, Mr. Warren Peters, indicates that the timber on the McDonald property, and by implication on the Crawford property, had died due the extended inundation from water "more or less 10, 12—8, 10, 12 years ago."[14] All that can be properly inferred from Mr. Peters' statement is that the timber was dying due to water inundation sometime between 1984 and 1988. The statements of both defendant's expert and plaintiffs' expert therefore hold open the possibility that plaintiff McDonald's cause of action for the destruction of timber, or at least for the destruction of certain timber species, did not accrue until after February 18, 1986. This possibility is not eliminated by Mr. Williams' letter.

---

12. McDonald Compl. at 3.

13. Pls.' Opp. at 3.

14. Def.'s Mot., Ex. 6 at 19.

Mr. Williams' letter states that water had damaged timber on plaintiffs Crawford's property, and by implication on plaintiff McDonald's property, at least as of February 17, 1986. In addition, the letter indicates that the damaged timber "probably would not recover even if the water were removed."[15] The letter does not, however, specifically state which species of timber had been damaged, nor does it indicate the quantity of timber damaged. Further, the letter does not state that all of the timberlands were under water as they allegedly are now but rather indicates only that the ground was too soft to harvest timber. It is upon these facts that the court must determine whether, prior to February 18, 1986, the timber damage on plaintiff McDonald's property had so manifested itself that a final account could have been struck. *See Dickinson,* 331 U.S. at 749, 67 S.Ct. at 1385.

■ As previously noted, the Federal Circuit stated in *Cooper* that a taking cause of action for damage to timber cannot accrue until the extent of the destruction is ascertainable. *Cooper,* 827 F.2d at 764. Applying this standard, the Federal Circuit held that, although water invaded the property's surface and trees began to perish in 1979, the plaintiff's claim did not accrue until 1984 when the extent of the damage was ascertainable. *Id.* Significantly, in 1979, the number of dead trees, which were scattered throughout approximately two hundred acres of timberland, covered about two acres. *Id.* at 762–63. By 1984, the dead timber represented the equivalent of approximately seventy-five acres of the plaintiff's total timberland. *Id.* at 763.

Plaintiffs in the present case do not indicate the amount of timber that had perished in any given year. Instead, plaintiffs generally assert that standing timber is dying and future growth of new trees is impossible. Nevertheless, here, as in *Cooper,* "the critical question is: When did the destruction of trees become sufficiently stabilized so that the owner could determine the *amount* of

timber taken." *Id.* (emphasis added). In the present case, the experts' opinions indicate that stress on certain timber species on plaintiffs' properties may not have been visible until 1987 or 1988, well within the statute of limitations.[16] It is axiomatic that, until those trees became visibly stressed, plaintiffs had no manner in which to ascertain the extent of destruction to those trees and thus were unable to determine the *amount* of timber taken.

In addition, any distinction regarding stress on different timber species is irrelevant in determining whether plaintiffs' causes of action for the taking of their timber are time-barred. Indeed, were the court to require plaintiffs to separately bring their claims for each timber species, it would run afoul of the established principle that an "owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really taken." *Dickinson,* 331 U.S. at 749, 67 S.Ct. at 1385.

■ Moreover, even if damage to one species of trees may have been visible prior to 1986, the fact that damage to other species may not have been visible leads to the necessary conclusion that plaintiffs could not ascertain the amount of timber taken until such damage became visible. While a plaintiff may not wait to bring a cause of action "until any possibility of further damage ha[s] been removed," *Columbia Basin,* 88 F.Supp. at 739, a plaintiff must at least be able to determine the extent of the destruction before the cause of action can be said to have accrued, *Cooper,* 827 F.2d at 764. Thus, allowing plaintiffs to proceed with their claims for the taking of timber does not violate the tenet that "it is not necessary that the damages from the alleged taking be complete and fully calculable before the cause of action accrues." *Fallini,* 56 F.3d at 1382.

The court concludes that plaintiff McDonald's cause of action for the taking of timber could not have accrued until he was able to evaluate the extent of the damage to

---

15. *Id.,* Ex. 5 at 3.

16. Defendant's expert gives 1987 as the outside estimate, which still places plaintiffs' claims for

those species of timber within the statute of limitations.

his timber. Such an evaluation was impossible until the stress on all the various timber species became visible, which the experts allow may not have occurred until after 1986. Prior to that happening, the situation was not sufficiently stabilized such that plaintiff McDonald could have determined the amount of timber taken. *Cooper*, 827 F.2d at 764. Thus, plaintiff McDonald has made a *prima facie* showing that his cause of action for the taking of timber may have accrued within the applicable statute of limitations. *See Raymark*, 15 Cl.Ct. at 338. Specifically, the facts reveal a possible basis on which plaintiff McDonald might prevail in his argument that his claim for the taking of timber was timely filed. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. The court therefore denies defendant's motion to dismiss plaintiff McDonald's claim for a loss of standing timber.

## II. *Crawford Complaint*

Plaintiffs Crawford filed their complaint in this court on May 22, 1992. To fall within the statute of limitations, the Crawford plaintiffs' alleged taking cause of action, therefore, must have accrued no earlier than May 22, 1986. It is, however, undisputed that plaintiffs Crawford have been cognizant of certain physical facts underlying the alleged taking since at least May 21, 1986.

The first indication that the project was interfering with plaintiffs Crawford's property appears in Mr. Williams letter of February 17, 1986. Further, in a letter to the District, dated May 22, 1986, plaintiff David Crawford claims that increased water levels created by defendant's project had caused plaintiffs Crawford's property to be wet twelve months of the year and consequently deprived them of any economic use of the land. Plaintiff David Crawford therefore sought compensation negotiations with the District for a taking of their property.

More specifically, plaintiff David Crawford states that "[c]ampsites in the area are no longer accessible by road, and crawfish farming is impossible because the property never dries out." [17] He also alleges that timber was dying and could not be forested because the land is too wet for the use of equipment. In addition, he indicates that plaintiffs Crawford "have been waiting for the water to go down, but it has not, and likely will not absent a lowering of the artificially high levels of the Darbonnes." [18] Plaintiff David Crawford also cites Mr. Williams' letter in asserting that the timber would not be salvageable even if the water were removed. Plaintiff David Crawford's letter, and a subsequent admission that he had knowledge of the contents of his letter on May 21, 1986, indicate that plaintiffs Crawford not only should have known but actually knew of the consequences of defendant's actions more than six years before filing their complaint in this court. Thus, unless plaintiffs Crawford were justified in delaying the filing of their complaint, their claims are time-barred. *Fallini*, 56 F.3d at 1381.

Plaintiffs Crawford generally contend that they were justified in delaying the filing of their complaint because their cause of action could not have accrued until they learned that defendant was the party responsible for the damage to their property. Plaintiffs Crawford further assert that they were unaware of defendant's involvement until plaintiff McDonald's attorney contacted them in early 1986. The court is unpersuaded by this argument.

In *M.R.K. Corp. v. United States*, 15 Cl.Ct. 538, 544–45 (1988), the court distinguished: (1) cases in which the facts, although not known by the plaintiff, are knowable; and (2) cases in which the facts are inherently unknowable. There, the court determined that the causal connection between the defendant's actions and the damage to the plaintiffs' land "was not even theoretically clear." *Id.* at 544. By contrast, in the case of plaintiffs Crawford, the causal connection between the new water regimen and some damage to their property was clear at least as early as February 1986. In addition, although plaintiffs Crawford recognized the likelihood of the existence of a claim and filed a complaint with the District, the knowledge of defendant's involvement in the project was not

---

**17.** *Id.*, Ex. 5 at 1.

**18.** *Id.*

unknowable to them. In fact, plaintiff David Crawford's letter to the District shows that plaintiffs Crawford were aware of defendant's involvement in the project at that time. The letter states, in relevant part: "The Corps of Engineers recently completed a water project ... by raising the levels of ... the Darbonnes...." It is, therefore, clear to the court that, by May 21, 1986, plaintiffs Crawford knew of defendant's involvement in the project.

### A. Damage to the recreational use of plaintiffs Crawford's property

In his letter to the District, plaintiff David Crawford specifically states that campsites are no longer accessible and crawfish farming is impossible. This statement indicates that, "at least by [the time the letter was written], the situation had become clearly apparent, and therefore had 'stabilized' within the meaning of *Dickinson*." *Fallini*, 56 F.3d at 1382. There is no evidence to indicate that plaintiffs Crawford were justified in delaying the filing of their claim for such damage. In addition, the foregoing discussion regarding inundation and plaintiff McDonald's crop land supports the court's conclusion that plaintiffs Crawford's claim for fair market value loss of land used for recreational purposes is time-barred.

### B. Damage to plaintiffs Crawford's timber

Mr. Williams' letter, and the reference to that letter in plaintiff David Crawford's letter, show that plaintiffs Crawford were aware of damage to some of their timber at least as of February 17, 1986. Nevertheless, just as the court imputes the statements in Mr. Williams' letter to plaintiff McDonald's timber, so too does the court recognize the applicability of Mr. LaFleur's and Mr. Peters' statements to all plaintiffs. As such, the discussion regarding plaintiff McDonald's timber is also applicable regarding plaintiffs Crawford's timber.

As with plaintiff McDonald, plaintiffs Crawford's cause of action for the taking of timber could not have accrued until they were able to evaluate the extent of the damage to their timber. *Cooper*, 827 F.2d at 764.

Based upon the experts' opinions, the court determines that such an evaluation may not have been possible until 1987 or 1988. Because plaintiffs Crawford may not have been able to ascertain the amount of timber taken until after May 22, 1986, their cause of action for a taking of timber may have accrued after that date. Although plaintiff David Crawford's letter alleges a taking of timber, the experts' opinions provide *prima facie* evidence to justify plaintiffs Crawford's delay in the filing of their claim for such a taking in this court. *See Raymark*, 15 Cl.Ct. at 338. The court therefore denies defendant's motion to dismiss the Crawford complaint to the extent that it alleges a loss of standing timber.

### Conclusion

For the above-stated reasons, the court denies defendant's motion to dismiss the McDonald complaint with regard to the alleged taking of timber. The court grants defendant's motion to dismiss the portion of the McDonald complaint that alleges a taking of plaintiff McDonald's crop land. The court denies defendant's motion to dismiss the Crawford complaint only with regard to the alleged taking of timber. The court grants defendant's motion to dismiss the portion of the Crawford complaint that alleges a taking of the recreational use of their property. Finding that there is no just reason for delay, the Clerk is directed to enter a partial dismissal, pursuant to Rule 54(b), as to the portions of the McDonald and Crawford complaints that allege takings for any property other than timber. The parties are directed to file with the court a joint statement indicating further proceedings in this case by February 2, 1997. No costs.